Victor Eugene RIOS, Petitioner–
Appellant,

v.

Teresa ROCHA, Warden, Respondent–
Appellee.

No. 01–15835.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 11, 2002.

Filed July 31, 2002.

Quin Denver, Federal Defender and Ann C. McClintock, Assistant Federal Defender, Sacramento, CA, for the petitioner-appellant.

Bill Lockyer, Attorney General for the State of California; Robert R. Anderson, Chief Assistant Attorney General; Jo Graves, Senior Assistant Attorney General; John G. Mclean, Supervising Deputy Attorney General; and Harry Joseph Colombo, Deputy Attorney General, Sacramento, CA, for the respondent-appellee.

Before REINHARDT, NOONAN, and FERNANDEZ, Circuit Judges.

Opinion by Judge REINHARDT; Dissent by Judge FERNANDEZ.

## OPINION

REINHARDT, Circuit Judge.

In the early morning hours of November 22, 1986, James Hampton, a member of the "Bloods" street gang, was shot and killed in front of the A/C Pizza and Deli in Sacramento, California. There were somewhere between 50 and 200 patrons at the location that night, many of whom were drinking and partying outside the establishment at the time the shots were

fired.[1] Among those present were members of both the "Crips" and "Bloods," rival street gangs. In March of 1987, Victor Rios and John Lewis were charged with Hampton's murder. At their joint state court trial, Lewis presented a mis-identification defense[2] while Rios presented an unconsciousness defense.[3] The jury acquitted Lewis, but found Rios guilty of second-degree murder with the personal use of a firearm in violation of California Penal Code §§ 187, 189, and 12022.5. After denying Rios's motion for a new trial, the trial judge sentenced him to fifteen years to life for the murder conviction and a two-year consecutive sentence for the use of a firearm.

Rios appealed his conviction, but his direct appeals were denied. He then filed a state habeas corpus petition in the California Superior Court alleging *inter alia* that his trial counsel was constitutionally ineffective because he failed to investigate the case. Of the dozens of potential eyewitnesses, Rios's counsel interviewed only one before determining not to offer any evidence that Rios did not shoot Hampton and to rely instead on the expert testimony that counsel thought might establish that Rios was not conscious of his actions at the time of the shooting.

■■■ The California Superior Court agreed that Rios's counsel failed to reasonably investigate the case and that, as a result, his performance had been deficient, but it concluded that Rios was not entitled to habeas relief because there was not a reasonable probability that the outcome of his trial would have been different had counsel provided effective legal services. Rios pursued his ineffective assistance claim by filing state habeas petitions in the California Court of Appeal and the California Supreme Court, but they were summarily denied. He then filed a federal habeas petition in the district court on February 9, 1994. That court, after ordering the deposition of an eyewitness and expanding the record to include some additional declarations and records, denied the petition on March 14, 2001. Rios appeals that decision.[4]

1. There were varying accounts of the number of people at the location at the time of the shooting. Two witnesses testified that there were approximately 200 people there. One witness testified that there were at least 50. Another witness estimated that there was a crowd of 50 to 60 people at first but that it had grown to probably 100 people when the shots were fired. Two other witnesses believed that over 100 people were milling about at the time of the shooting.

2. A misidentification defense is, for all practical purposes, the same as an actual innocence defense. In short, Lewis argued that he was not the shooter and that the prosecution did not have sufficient evidence to prove otherwise beyond a reasonable doubt.

3. Rios testified that he had no memory of what occurred that night because Hampton had severely beaten him earlier in the evening. His counsel then presented the testimony of a neurologist and a psychologist who explained that he was suffering from amnesia as a result of a concussion. Under California criminal law, an individual "who committed the act charged without being conscious thereof" is not criminally liable. Cal.Penal Code § 26(4). Such unconsciousness "can exist ... where the subject physically acts in fact but is not, at the time, conscious of acting." *People v. Newton*, 8 Cal.App.3d 359, 376, 87 Cal.Rptr. 394 (1970). Rios's defense was based on the Penal Code section.

4. Because the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") and its amendments to 28 U.S.C. § 2254 apply only to federal petitions filed after April 24, 1996, we do not review Rios's habeas petition under AEDPA's more deferential standard of review. *See Lindh v. Murphy*, 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1495–96 (9th Cir.1997) (en banc), but under our prior habeas standard. A claim alleging ineffective assistance of counsel is a mixed question of law and fact that is reviewed *de novo*. *See Hendricks v.*

We agree with the California Superior Court that the performance of Rios's counsel was deficient. We do not, however, agree with the state court's conclusion that Rios was not prejudiced by his counsel's failure to investigate. Five additional eyewitnesses to the shooting provided declarations and/ or testimony during the state and federal habeas proceedings affirmatively stating that Rios did *not* shoot Hampton. Given the nature and the number of the witnesses willing to testify on Rios's behalf, and the highly exculpatory nature of their testimony, our confidence in the outcome of the trial has been undermined. Because there is a reasonable probability that the outcome would have been different had Rios's counsel investigated the case and presented the testimony of the available witnesses at trial, we reverse the district court's decision.

## I. FACTUAL BACKGROUND

By the early morning of November 22, 1986, somewhere between 50 and 200 people had gathered at the site of the A/C Pizza and Deli at the end of Auburn Avenue in Sacramento, California, where they were drinking and engaging in other group social activities. Rios, Lewis, and three young women—Tonya Hayden, Dolores Parrish, and Yvette Taylor—went to the area to join the growing party. Rios drove his Cadillac, with Lewis in the front passenger seat and the three women in the back. As Rios attempted to park his car in front of the deli, Hampton approached him and told him to move. When Rios reached out the window on the driver's side to introduce himself and to shake hands, Hampton began punching him hard in the face. He struck Rios on the temple and on his nose, and Rios began to bleed profusely. Hampton also kicked the rear window of Rios's car on the driver's side in an attempt to break it. Although James Barren, a friend of Hampton's, attempted to pull Rios out of the car, Rios managed to drive away.

At trial, various witnesses testified that Rios was not the first person with whom Hampton had engaged in a confrontation that night. In fact, witnesses observed Hampton taunting members of the rival gang, waving a gun around, threatening some people, and physically attacking a number of others.[5]

---

*Calderon*, 70 F.3d 1032, 1036 (9th Cir.1995). Moreover, we consider the district court's denial of Rios's habeas petition *de novo*. *Id.* The district court's factual findings, however, are reviewed for clear error. *Id.*

5. Specifically, Eugenia Carter testified that Hampton was yelling at her earlier that night, because she was wearing a blue scarf. Blue rags were worn by members of the "Crips" gang and red rags were worn by members of the "Bloods" gang. Hampton was a "Blood." Carter also testified that she saw Hampton waving a gun in the air, yelling "four, five, six, Blood," and beating people up with the help of his fellow gang members. Carter told the jury that, in addition to the silver gun he was waving around, Hampton had six or seven other guns in his truck.

Deborah Carter, Eugenia's sister and one of the prosecution's witnesses, testified that Hampton was waving a gun around that night and yelling that he was a "Crip killer." He directed a lot of his threats at the "L.A. guys," who were members of the Crips gang.

Robert Wilson testified that Hampton attacked five people that night before he attacked Rios including "an elderly white guy" and "a heavy-set Chicano guy." Barbara Middleton then corroborated that she saw a white male who had been beaten up lying in the gutter at the deli.

Both Deborah and Eugenia Carter testified that they saw Hampton with a silver gun and saw James Barren retrieve the gun after Hampton was shot. Robert Wilson testified that he saw a "light-skinned black guy" (later identified as James Barren) lean over Hampton's body and then tuck something into his belt.

After his encounter with Hampton, Rios drove first to his house and then to his mother's. At trial, one of the three women in the car, Tonya Hayden, stated that she saw Rios and Lewis enter his mother's house and return with guns. This contradicted Hayden's initial statement to the police, in which she stated that she did not see Rios and Lewis carrying guns that night. The other two women in the car testified, consistent with Hayden's initial statement, that they did not see Rios and Lewis return with guns. All three women did, however, state that Lewis and Rios said they were going to "get" Hampton. Approximately thirty minutes later, they returned to the site of the prior incident in Rios's car. Rios stopped about a block away from the deli and told the women to turn the car around and wait there. Rios and Lewis then got out and walked to the area where all the drinking was occurring. Soon afterwards, Hampton was shot five times. At trial, the pathologist testified that he was shot twice in the chest with a small caliber weapon and three times in the back with a larger, different caliber weapon.

Shortly after the shooting, Rios and Lewis got back in the car and Dolores Parrish, who had become the driver, drove away. Taylor testified that she saw a gun in the back seat, but Parrish and Hayden testified that they did not. After stopping briefly once again at Rios's mother's house and Rios's own house, the group drove together to Reno, Nevada and then on to Cleveland, Ohio. All five were arrested shortly after they arrived in Cleveland.

Both Lewis and Rios were charged with murder and their cases were consolidated for trial. Rios privately retained Ronald Castro as his counsel. Eventually, however, Rios was unable to pay Castro. Approximately one week before the trial started, the California Superior Court appointed Castro to represent him.

At trial, the State presented the testimony of five eyewitnesses. Three of them were the young women who had been in the car with Rios and Lewis: Yvette Taylor (16 years old), Tonya Hayden (19 years old), and Dolores Parrish (27 years old). Hayden, who initially told the police that she did not see either Rios or Lewis with a gun on the evening in question, testified that, as the three women drove past the club when turning the car around, she saw Lewis and Rios shoot Hampton with Lewis firing first. Hayden did admit, however, that she was "real high" that night, because she was under the influence of both alcohol and drugs. Specifically, she testified that she had consumed portions of two pints of brandy and had also had a 40 ounce bottle of beer before she met up with Rios and Lewis. She stated that afterwards, but before the shooting, she, the defendants, and the two other young women in Rios's car shared a pint of gin and a joint of marijuana laced with cocaine.

Parrish testified that she did not see Lewis shoot Hampton, but she did see Rios shoot at Hampton after Hampton was already on the ground. She testified that she heard Rios fire his gun three times and observed him with a silver gun around the time of the shooting. When Parrish first spoke to the police, however, she told them that she did not see the shooting. Both Hayden and Parrish testified that afterwards in the car, Lewis said that he had shot Hampton several times. Parrish admitted that she was drunk that night because she had been drinking champagne, wine coolers, brandy, beer, and gin. She also admitted that she had shared the marijuana joint laced with cocaine with Hayden and the others.

Taylor's preliminary hearing testimony was read to the jury.[6] She stated that she saw both Lewis and Rios shoot Hampton; first Lewis, and then Rios. Taylor testified that she heard Rios fire three times. Taylor admitted to drinking three cups of champagne that night, but she denied that anyone in the car was using drugs.

The three young women testified to hearing a varying number of shots fired that night. Hayden claimed to have heard a total of five, although she told the police in her initial statement that she had heard nine and later told a detective that she had heard 22. Parrish said she heard nine, and Taylor reported hearing six.

The State also called fifteen-year-old Deborah Carter, a witness who was at the scene on the night of the shooting. Carter testified that she knew Rios from the neighborhood. She testified that she drank a lot of alcohol the night of the shooting and, although she needed glasses because of her nearsightedness, she was not wearing glasses at the time.[7] She testified that she saw Hampton attack the driver of a car that she believed belonged to Rios. She admitted that she could not see clearly the person in the car, but she assumed that it was Rios because she recognized the car.

With respect to the shooting, Carter initially testified that she saw Rios shoot Hampton. However, she then admitted on the stand that she did not actually see him do so; rather, she heard shots and then saw someone who resembled Rios standing over Hampton's body on the ground. She also testified that she did not form her opinion that Rios was the shooter she observed until the next morning. She stated that she did not know whether Rios was the actual shooter because at the time of the shooting, she was drunk and could not see clearly due to her poor eyesight, which is even worse when she is drinking. She testified that she only thought Rios was present at the scene because she recognized his car.

Carter also testified to hearing twenty-two shots coming from different directions. She stated that she saw a man named "Mario" fire a weapon and believed that a man named Robert Wilson also fired his shotgun. She also saw a "lightskinned black guy" with a gun that night. She also heard shots coming from the area where the "L.A. guys," who were members of the Crips gang, were standing.

The fifth eyewitness for the State was Sherri Herndon. She was with some friends in front of the deli on the night of the shooting. Herndon testified that she had been drinking beer that night and described herself as "almost drunk." She witnessed Hampton's attack on Rios while Rios was in his car. Herndon testified that she saw Rios approximately three feet in front of Hampton just before the shooting began, but she never saw Rios holding a gun. She testified that she saw two pairs of men approaching Hampton just moments before he was shot. Rios was in one of these two groups. She was not able to identify the man who was with Rios except that she knew that he was black. She thought the other pair of men were Hampton's friends.

Herndon testified that she heard approximately three to four shots fired but did not see who shot Hampton. Just before Hampton was shot, however, she tes-

6. Yvette Taylor disappeared after giving her preliminary hearing testimony and could not be located when the trial began.

7. Carter's eyesight was extremely poor. She was not wearing glasses during her testimony at trial and was not able to see Lewis, the co-defendant, clearly from the witness stand.

tified that a white Bonneville drove up. The driver got a shotgun from the trunk and fired it at Hampton.[8] She stated that after the shooting began, she saw Robert Wilson shoot a shotgun and then saw Hampton fall to the ground.

The prosecution did not introduce any gun or other weapon into evidence; nor did it offer any physical evidence of any kind linking either defendant to the crime. Finally, it did not assert that either Rios or Lewis was a member of either the "Bloods" or the "Crips." After the prosecution rested, both Lewis and Rios presented evidence. Lewis presented a misidentification defense. He called four witnesses, but did not testify himself.[9] Rios presented only an "unconsciousness" defense.

Eugenia Carter, the eighteen-year-old sister of state witness Deborah Carter, testified on Lewis's behalf. She, along with her sister and some friends, were present outside the deli on the night in question. Carter stated that she did not see Lewis anywhere near Hampton at the time of the shooting. However, she did say that, when she spoke to the police that evening, she told them that Rios was the shooter. She had seen Rios's car at the scene and saw Hampton beat up the person in that car. She testified that, when she spoke to the police, she assumed that the shooter was Rios, because the shooter was light-skinned and had long hair. At trial, however, she admitted that she could not really see the shooter's face. Further-

more, she testified that she did not see the light-skinned person fire directly at Hampton, but rather saw him shoot in the general vicinity of Hampton as Hampton was falling to the ground.

Carter estimated that she heard over twenty shots fired. She testified that she saw Robert Wilson hand a shotgun to a "skinny black guy" who then shot at Hampton twice. Carter also witnessed Hampton fall to the ground after "the fat L.A. guy" fired his gun twice.[10] She also testified that "Mario" had fired a gun. Carter testified that she did not tell the police about "Mario" or "the fat L.A. guy" because she was scared.

Robert Wilson, another eyewitness, also testified on behalf of Lewis. Wilson heard several shots fired from different guns. The night of the shooting, Wilson told the police that Rios shot Hampton. Wilson told the police that, after he saw Rios approach Hampton, he fired his shotgun in the air to make everyone run, including Rios, so as to keep everyone out of trouble. However, at trial, he stated that he lied to the police because he was being threatened by the investigating officers. Wilson was arrested the night of the shooting and interrogated. He testified that, at first, he told the officers that he did not see Rios shoot Hampton, but then he changed his statements when they advised him that he should tell them what they wanted to hear—that Rios did so—or risk going to jail for the crime himself.[11] At trial, Wilson testified that he did not see Rios walk-

---

8. At trial, the pathologist testified that there was no evidence that Hampton was shot by a shotgun.

9. Lewis also called Howard Sihner as a witness in his defense. Sihner was an investigator for the District Attorney's Office. He testified that Yvette Taylor escaped from his custody and had not yet been located, thus necessitating that her preliminary hearing testimony be read to the jury.

10. Carter testified that the "skinny" guy and the "fat" guy were together in a car.

11. On cross-examination, Wilson denied that he was scared that Rios was going to come after him and that he was afraid of being found in violation of his probation.

ing towards Hampton and did not see who fired the shots. He did, however, observe a heavy-set Chicano man ten feet away from Hampton at the time of the shooting. Wilson thought that the Chicano man could be the shooter, because he had seen Hampton beat him up earlier. Wilson testified that he saw Hampton start several other fights that night, as well as brandish several guns. He did not mention seeing Lewis on the night in question.

Barbara Middleton was also present on the night of the shooting and also testified as a defense witness for Lewis. She stated that she witnessed Hampton attack Rios in his car. She testified that, later in the evening, she heard seven shots, including shots from a shotgun and a smaller gun. Middleton stated that she saw Robert Wilson fire the shotgun but she did not see who fired the smaller gun. She testified that she did not see Rios with a gun. Middleton did not mention Lewis in her testimony.

Antonia Smith was Lewis's final defense witness. She was one of the people present at the location of the shooting. She testified that she saw a dark-skinned black man with "Jerry curls" drive up in a tan car. He got out of the car and said, "You mother-fuckers want to jump somebody, jump this" and then shot at Hampton four or five times. She stated that this man

was not Lewis or Rios. Smith testified that she never saw Rios at the scene of the shooting:

After Lewis finished presenting his evidence, Rios testified in his own defense, primarily on the issue of the physical and mental consequences of his beating by Hampton.[12] Rios's defense counsel called two experts to support the "unconsciousness defense," Dr. Pierre Dreyfus, a neurologist,[13] and Dr. Daniel Edwards, a clinical psychologist.[14] An unconsciousness defense is an affirmative defense in California criminal law. Specifically, if the defendant "committed the act charged without being conscious" of the act performed, he is not criminally liable. Cal.Penal Code § 26(4). The level of unconsciousness "need not reach the physical dimensions commonly associated with the term (coma, inertia, incapability of locomotion or manual action, and so on); it can exist ... where the subject physically acts in fact but is not, at the time, conscious of acting." *People v. Newton*, 8 Cal.App.3d 359, 376, 87 Cal.Rptr. 394 (1970). Rios's counsel argued that Rios was not "conscious" at the time of the shooting, because he had a concussion and was suffering from amnesia due to his fight with Hampton earlier that night. He did not present any testimony from witnesses who

12. Rios testified that after being punched in the face by Hampton, he only remembered there being a lot of blood and bright light. He did not remember anything else about the evening. He stated that the next thing he recalled after being beaten was waking up in a parking lot in Reno. When he first woke up in Reno and again when he was in Cleveland, Rios said that he experienced a lot of pain and dizziness. Rios testified that he continued to feel numb, suffer from headaches, and have memory problems.

13. Dr. Dreyfus testified that it was his opinion that Rios had suffered a moderately severe concussion and was currently suffering from

post-traumatic head syndrome. On cross-examination, he testified that he could not definitely state that Rios had a concussion or amnesia; he relied only on clinical information. Dr. Dreyfus testified that it was his opinion that Rios suffered amnesia from the concussion but that he couldn't state how long the amnesia would have lasted.

14. Dr. Edwards testified regarding his examination of Rios for organic brain injury. He stated that it was his opinion after examining Rios on two occasions that Rios had suffered brain damage as a result of being beaten by Hampton.

saw the shooting.[15]

The State called two expert witnesses to rebut Rios's expert evidence. The jury acquitted Lewis but found Rios guilty of second-degree murder.

## II. DISCUSSION

 Rios contends that he received ineffective assistance of counsel in violation of his Sixth Amendment rights because his counsel (1) failed to hire an investigator; (2) failed to request funds for an investigation; (3) failed to interview witnesses; (4) improperly relied on the investigation done by his co defendant's counsel; (5) failed to adequately research and present the defense of unconsciousness; and (6) failed to investigate whether Rios's drinking and drug consumption precluded a finding of malice. In order to prevail on an ineffective assistance of counsel claim, Rios must demonstrate first that the performance of his counsel fell below an objective standard of reasonableness, and second that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Franklin v. Johnson,* 290 F.3d 1223, 1237 (9th Cir.2002). Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

### A. Deficient Performance

 Although there is a "strong presumption that counsel's conduct falls within the wide range of reasonable profession-al assistance," and "[j]udicial scrutiny of counsel's performance must be highly deferential," *id.* at 689, 104 S.Ct. 2052, defense counsel must, "at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client," *Sanders v. Ratelle,* 21 F.3d 1446, 1456 (9th Cir.1994) (emphasis in original); *see also Jennings v. Woodford,* 290 F.3d 1006, 1013 (9th Cir. 2002). A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney "neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so." *Sanders,* 21 F.3d at 1456; *see also Phillips v. Woodford,* 267 F.3d 966, 980 (9th Cir.2001). Thus, counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. The failure to investigate is especially egregious when a defense attorney fails to consider potentially exculpatory evidence. *See Lord v. Wood,* 184 F.3d 1083, 1093 (9th Cir.1999) ("A lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance.").

 Here, we conclude, as did the California Superior Court, that Castro's failure to reasonably investigate Rios's case prior to selecting a defense strategy constitutes deficient performance. At the hearing on the motion for a new trial,[16]

---

**15.** Rios's only other witness was his girlfriend, Lesley Leatherwood. She testified about his behavior when he came back to the house after being assaulted by Hampton.

**16.** After the verdict but before sentencing, the trial court appointed Leroy Fong to represent Rios. Fong filed a motion on behalf of Rios

for a new trial on the ground of ineffectiveness of counsel. Fong argued that Castro was ineffective for failing to investigate the "wrong shooter defense." This defense is referred to herein as a "misidentification defense." Castro, William Lyons (Lewis's counsel), and Charles Pacheco (Lyons's inves-

Castro himself admitted that he made the decision to rely on an unconsciousness defense rather than a misidentification defense *prior to* the preliminary hearing. At that time, however, Castro had done little more than read the police reports and review one psychological report that had been ordered by the original public defender who had previously been assigned to the case. Aside from Rios, the only eyewitness Castro had interviewed was Yvette Taylor, a sixteen-year-old girl who admitted that she had been drinking on the night of the shooting, and who disappeared before the trial. Taylor's version of the events was enough, however, to cause Castro to conclude that "somebody was going to be able to put the gun in Victor's hand evidently." Castro made no attempt to determine whether other witnesses would corroborate Taylor's testimony or whether a misidentification defense was feasible.

The State contends that the decision to pursue an unconsciousness defense rather than a misidentification defense was a tactical or strategic decision based on reasonable assumptions. *See Pickens v. Lockhart,* 714 F.2d 1455, 1467 (8th Cir.1983) (stating that it is possible for a "reasoned choice based on sound assumptions" to be the basis of a decision not to investigate further). Having spoken to only one witness about the shooting, however, Castro had insufficient facts on which to make any reasonable assumptions or on which to base any reasonable decision as to the appropriate defense or defenses to be offered. At least fifteen other witnesses to the shooting were known to Castro at the time of the preliminary hearing. *See Avila v. Galaza,* 297 F.3d 911, 918–20 (9th Cir.

2002) (holding, in an attempted murder case in which the defendant was accused of shooting at two individuals, that the defense attorney rendered deficient performance because he failed to interview a number of potential eyewitnesses to the shooting); *Harris v. Wood,* 64 F.3d 1432, 1435–36 (9th Cir.1995) (citing as deficiencies counsel's failure to retain an investigator and failure to interview 29 out of 32 people identified in police reports). Castro acknowledged that in the very police reports that had been turned over to him before the preliminary hearing there was a statement that Parrish, another of the three women in the car, had made to the police in Cleveland in which she stated that Rios did *not* shoot Hampton. Thus, Castro admitted that, at the time of the preliminary hearing, "there was a legitimate conflict about whether or not Victor [Rios] was the shooter." However, rather than investigate in order to make a reasoned decision about whether a misidentification defense was feasible, Castro simply assumed that the other witnesses would identify his client as the shooter. Such an assumption is unreasonable, and any decision to forgo a defense on the basis of unreasonable assumptions is not a reasonable decision or a strategic or tactical decision entitled to deference. *See Avila,* 297 F.3d at 920 ("[C]ounsel can hardly be said to have made a strategic choice when s/he has not yet obtained the facts on which a decision could be made." (quoting *Sanders,* 21 F.3d at 1457) (alteration in original)). Castro's decision to abandon a misidentification defense after having spoken to only one eyewitness and to present instead only an unconsciousness defense, on the basis of one psychological report,[17] constitutes defi-

tigator) were called to testify at the hearing on Fong's motion.

**17.** Castro later had Rios examined by a neurologist and a psychologist; however, those

experts were not even hired until after Castro was appointed, which was shortly before the scheduled trial date. In fact, Rios's psycho-

cient performance. *See Avila*, 297 F.3d at 918–21 (holding that defense counsel's failure to interview potential eyewitnesses to a shooting when his client was accused of being the shooter constituted deficient performance); *Johnson v. Baldwin*, 114 F.3d 835, 837–40 (9th Cir.1997) (holding that defense counsel's failure to talk to more than two witnesses prior to trial constituted deficient performance); *United States v. Tucker*, 716 F.2d 576, 584 (9th Cir.1983) (holding that the failure to interview or attempt to interview key prosecution witnesses constitutes deficient performance); *Baumann v. United States*, 692 F.2d 565, 580 (9th Cir.1982) ("We have clearly held that defense counsel's failure to interview witnesses that the prosecution intends to call during trial may constitute ineffective assistance of counsel.").[18]

In *Phillips v. Woodford*, 267 F.3d 966, 980 (9th Cir.2001), we held that even though Phillips's counsel chose a defense that was not inconsistent with the facts or the defendant's testimony, counsel's performance was deficient because he failed to "reasonably select the [] defense used at trial." Once counsel reasonably selects a defense, it is not deficient performance to fail to pursue alternative defenses. *See Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998); *Turk v. White*, 116 F.3d 1264, 1267 (9th Cir.1997). However, like the counsel in *Phillips*, and unlike the counsel in *Turk* and *Bean*, Castro did not reasonably select

a defense. Rather, Castro made the decision to present evidence only with respect to an "unconsciousness" defense without investigating any witnesses who would support a claim of misidentification or insufficiency of the evidence, despite his knowledge that such witnesses might be available. Castro failed to obtain the essential facts on which to decide whether to present a misidentification defense, an unconsciousness defense, or both. Thus, at the point Castro made his determination—prior to the preliminary hearing—the decision to abandon the misidentification defense was patently unreasonable.

■ The State argues that Castro's failure to conduct an investigation was not unreasonable because he had access to the investigative reports and the trial materials prepared for Rios's co-defendant, John Lewis. However, both Lewis's counsel, William Lyons, as well as Lewis's investigator, Charles Pacheco, testified at the post-trial hearing that they did not provide Castro with copies of their investigative reports. Lyons did recall giving Castro a list of his witnesses shortly before trial along with a brief synopsis of each witness's testimony. He also recalls handing Castro copies of reports for witnesses who were discovered *during* trial, but he denies that he ever provided Castro with a copy of his trial notebook or with earlier investi-

logical examination took place *after* the trial had already started.

**18.** We highly doubt that a decision not to present a misidentification defense and to present instead only an unconsciousness defense would, under the circumstances of this case, have constituted a reasonable strategic or tactical choice, regardless of the facts an investigation uncovered. First, a misidentification defense need not conflict with an unconsciousness defense. A trial strategy could be formulated in which the defenses would be *complementary* rather than *conflicting*. More

important, had Rios's counsel performed a reasonable investigation before trial and compared the weak expert testimony in support of an unconsciousness defense to the strong eyewitness testimony in support of a misidentification defense, *see infra* Section II.B., he would almost certainly have chosen to present a misidentification defense *in lieu of* either an unconsciousness defense or a combination of the two. In any event, there is no possible justification for failing to at least conduct a preliminary investigation of both defenses before choosing one or both.

gative reports. Even if we credit Castro's version of the events, however, Castro himself admitted that he did not have much contact with Pacheco "until shortly before and during the course of the trial." He stated that he received Lyons's trial book only nine days before trial and reviewed it for only twenty to thirty minutes. Castro never testified that he looked at any reports from Pacheco prior to the time he made his decision to present only evidence that would support an unconsciousness defense. At the time that he made the decision not to present a misidentification defense, and not to investigate the possibility of doing so, he had not seen any of Lewis's investigative reports; therefore, he cannot now claim that those reports were the basis of his decision to abandon a misidentification defense. Moreover, even if Castro had seen the reports prior to the preliminary hearing, it would have been unreasonable for him to rely solely on the investigation performed for a co-defendant, because the co-defendant's interests in the case might well conflict with Rios's own. Pacheco testified, for example, that he was looking for information to exculpate Lewis, not Rios. One possible strategy for Lewis would have been to accuse Rios of being the shooter. In fact, two of Lewis's witnesses at trial, Eugenia Carter and Robert Wilson, initially told the police that Rios shot Hampton. Thus, whatever help Pacheco's reports may or may not have been, Castro could not reasonably rely solely on those reports any more than he could reasonably have relied solely on the police reports provided to him prior to the preliminary hearing. *See Lord*, 184 F.3d at 1089 (concluding that it was unreason-able for an attorney to rely on police reports in lieu of interviewing witnesses).

 Castro also testified that he made the choice not to investigate a misidentification defense and to pursue an unconsciousness defense instead partially because there were insufficient funds to investigate the events of the night of the murder. However, Castro's reluctance to ask for public funds to hire his own investigator was not a proper reason for failing to pursue an initial investigation into potentially feasible defenses. Castro was obviously aware that public funds were available if he needed them given that both of the mental health experts who Castro hired were paid with such funds. Although Rios did express some concern over having *an attorney* who was paid by the county, for fear of underzealous representation, he never expressed any unwillingness to use public funds to hire an investigator.

In sum, we agree with the state court and hold that Castro's failure, in a first-degree murder trial, to interview more than one witness, when there were dozens of potential eyewitnesses available, before deciding to abandon a potentially meritorious defense constituted constitutionally deficient performance.[19]

## B. Prejudice

 Because we hold that Castro's performance was objectively unreasonable, we now consider whether his deficient performance prejudiced Rios. *See Harris*, 64 F.3d at 1435. In evaluating prejudice, we have stated that "ineffective assistance claims based on a duty to investigate must

---

**19.** Despite our colleague's customarily colorful dissent, it was clear to the California state court that counsel "failed to meet the standard of a reasonably competent advocate" and that his performance was deficient. Under the cases discussed above, *see supra* Sec-tion II.A., the state court's decision was clearly compelled by law. Thus, our dissenting colleague's attempt to portray counsel's performance as exemplary and his choice of an unconsciousness defense as "Rios's best hope" is quite remarkable.

be considered in light of the strength of the government's case." *Eggleston v. United States,* 798 F.2d 374, 376 (9th Cir. 1986).

 Here, although the State did introduce the testimony of five eyewitnesses, their testimony was both inconsistent and severely impeached. For example, although Deborah Carter initially stated that Rios shot Hampton, she later admitted that she did not actually see him do so. Rather, she decided the next day that Rios had shot the victim, because she recognized Rios's car. Moreover, Carter admitted that she was drunk on the night of the shooting and had very poor eyesight. Sherri Herndon testified that she did not see who fired the shots. She did see Rios approach Hampton just before the shooting but she also testified that Rios did not have a gun at the time. Herndon admitted that she was "almost drunk" that night.

With Deborah Carter retracting her statement that she saw Rios shoot Hampton and Sherri Herndon stating that she did not see who fired the shots, the three young women in the car with Rios and Lewis that night were the only prosecution witnesses to testify at trial that Rios shot Hampton.[20] All three women admitted, however, that they had been drinking heavily that night, and two of them admitted that they had been smoking marijuana laced with cocaine. Additionally, there were material inconsistencies in their statements to the police about what happened over the course of the evening. For example, Hayden testified that Rios and Lewis retrieved guns from Rios's mother's house after Rios was assaulted by Hampton. Taylor and Parrish, however, stated that they did not see either of the two

bring any guns to the car. Taylor said that she saw a gun in the backseat of the Cadillac after Hampton was shot, but Hayden and Parrish testified that they did not see a gun in the car after the shooting. Hayden and Parrish testified that Lewis admitted that he shot Hampton several times, but Taylor did not remember him admitting anything. Taylor and Hayden said that Lewis shot Hampton first and Rios shot him after that, but Parrish testified that she did not see Lewis shoot Hampton at all.

Moreover, the trial testimony of the state's crucial witnesses differed in material respects from the stories they initially told police when they were arrested. For example, when Parrish was first arrested, she told the police, in direct conflict with her trial testimony, that she did not see the shooting and that Rios could not have been the shooter. In Hayden's initial statement to the police, she said that she never saw Rios or Lewis with a gun that night, but at trial she testified that they went to get guns after Hampton assaulted Rios.

There was also a great deal of testimony at the trial, both from the State's witnesses and the defense witnesses, about other possible shooters, a number of whom, witnesses testified, were observed shooting at Hampton and some of whom had a reason to want to harm him. Specifically, Deborah Carter heard shots coming from the area where the L.A. members of the Crips gang were standing, and Eugenia Carter also saw one of the "fat L.A. guy[s]" fire his gun at Hampton twice. Hampton, a member of the Bloods gang, had earlier been threatening the L.A. Crips by, among other things, waving his

---

**20.** It is true that Eugenia Carter and Robert Wilson, two of Lewis's defense witnesses, had previously said that Rios shot Hampton. However, they both retracted their prior statements and testified at trial that they could not see the face of the person who fired the shots.

gun at them and yelling "Crip killer." Robert Wilson testified that a "heavy-set Chicano man," whom Hampton had beaten up earlier that night, was ten feet away from Hampton at the time of the shooting and that he thought he might have shot him. According to other testimony, Hampton had attacked a number of individuals that evening, and according to Antonia Smith, a dark-skinned black man with "Jerry curls" drove up in a tan car, shouted "You mother-fuckers want to jump somebody, jump this," and shot Hampton four or five times.

Barbara Middleton, Eugenia Carter, and Deborah Carter all testified that they saw Robert Wilson firing a shotgun that night. Deborah and Eugenia Carter both testified that a man named "Mario" fired a weapon during the shootings. Additionally, Deborah Carter saw "a light-skinned black guy" with a gun that night. Eugenia Carter also saw a "skinny black guy" shoot Hampton twice with a shotgun. Witnesses heard anywhere from three to twenty-two gun shots. The coroner testified that Hampton was shot by multiple gun shots coming from different directions.

Additionally, it is clear that the State did not have a strong case against the two co-defendants for another reason. The jury acquitted one of them, Lewis, even though two of the State's three critical eyewitnesses, Tonya Hayden and Yvette Taylor, testified that they saw *both* Lewis and Rios shoot Hampton, and all of the state's evidence placed Lewis and Rios together at all relevant times throughout the night. Apparently, finding Hayden and Taylor's testimony unpersuasive, the jury acquitted Lewis.

In addition to demonstrating that the jury found Hayden and Taylor's testimony unpersuasive, at least in substantial part, the acquittal of Lewis also demonstrates that the jury did not give persuasive weight to the State's evidence that Rios and Lewis fled from California and drove to Ohio after the shooting. Although evidence of flight is *some* evidence of guilt, Lewis's counsel was able effectively to overcome any inference of guilt from the flight by presenting testimony that supported a misidentification defense—evidence similar to that available to Rios's counsel as well.

■ Thus, the State's case against Rios was at best a close one. There was no physical evidence of Rios's involvement in the shooting. There was no weapon found, no fingerprints, no gunpowder residue, no DNA evidence. The case depended almost entirely on the three eyewitnesses whose testimony the jury refused to accept in significant part when it acquitted Rios's co-defendant. There was direct testimony, although conflicting, that several other persons present that evening were the actual shooters. There was also testimony that a feud between rival gangs, the Crips and the Bloods, had led to physical violence involving Hampton earlier that very evening and that members of the Crips were involved in the shooting. The state did not assert that either Rios or his co-defendant was a member of either gang. With this understanding of the State's case, we must consider whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." *Id.* at 695, 104 S.Ct. 2052; *Franklin,* 290 F.3d at 1237.

Co-defendant Lewis's counsel, who investigated the case from his client's standpoint, presented four eyewitnesses who testified in support of Lewis's misidentification defense. Although the evidence showed that Lewis and Rios were together

at all times on the evening in question and suggested strongly that either both or neither were involved in the shooting, and although the prosecution's theory was that Rios and Lewis together obtained guns, went to the scene to look for the victim, found him and shot him, Rios's counsel, unlike Lewis's, failed to present any evidence that his client did not fire the shots and that other persons were responsible. Put simply, Rios's counsel offered no evidence of misidentification.[21] Instead, because of his unreasonable failure to investigate or to make any attempt to locate the numerous available witnesses, who, if called, would have testified that Rios, like Lewis, had been misidentified, he offered only the feeble defense that Rios was legally "unconscious" at the time of the shooting and could not remember what had happened.

The defense that Rios's counsel presented as a result of his failure to investigate was not only based on wholly inadequate information and thus constituted an unreasonable choice, see supra Section II.A., but the testimony offered in support of that defense in all likelihood contributed substantially to the prejudice Rios suffered. Rather than aiding in his defense, Rios's testimony that he did not remember any events that occurred at the time of the shooting likely helped the prosecution because, given the inconclusiveness of the experts' testimony, Rios's statements may well have communicated to the jury that even he thought that he might have shot Hampton. The presentation of Rios's amnesia testimony accompanied by the highly-equivocal expert testimony regarding his "unconsciousness," see supra notes 13–14, was a direct product of Rios's counsel's failure to conduct a proper investigation before selecting an ill-advised and uninformed defense that, true or not, derogated from the far more plausible defense that could have been offered—the defense successfully urged by his co-defendant.[22]

---

**21.** Although Rios's counsel did, in his closing argument to the jury, suggest that Lewis's evidence might support a determination that Rios did not shoot Hampton, Lewis's evidence was, in fact, of little affirmative help to Rios. Two of the four witnesses presented by Lewis had previously told police that they had seen Rios shoot the victim. See also Avila, 297 F.3d at 918–23 (holding, in an attempted murder trial in which the defendant was accused of shooting at two individuals, that counsel's failure to interview eight additional eyewitnesses who would have testified that the defendant was not the shooter was prejudicial even though counsel had presented three eyewitnesses at trial who corroborated the defendant's testimony that he was not the shooter).

**22.** If Rios's counsel had investigated the case before selecting the feeble and unsupported "unconsciousness" defense, he would have discovered a number of witnesses who were willing to testify that Rios did not shoot Hampton, see discussion infra. A reasonable defense attorney with ample exculpatory testimony from eyewitnesses would almost certainly have presented a misidentification defense and not an unconsciousness defense or a combination of the two. Although it would have been possible to offer both defenses simultaneously, see supra note 18, it is most likely, given the number of eyewitnesses who were willing to testify that Rios did not shoot Hampton and the tenuous nature of the conclusions reached by the expert witnesses who testified in support of an unconsciousness defense, that counsel would have opted to pursue only the misidentification defense. In short, had counsel investigated the facts, he would almost certainly not have offered Rios's testimony that he could not recall what happened at the time the shooting occurred, whether Rios's statements were true or not. Moreover, even if he had presented Rios's statements, they would have been offered in the context of direct testimony by a number of credible witnesses that Rios did not shoot Hampton, and a jury would then have been far more likely to accept them as true. In any event, to the extent that Rios's own statements may have contributed to the adverse jury verdict, they were offered as a direct consequence of counsel's failure to investigate

The record reveals that, had Rios adequately investigated the case prior to deciding on a defense, he would have uncovered substantial evidence supporting a misidentification defense—evidence at least as persuasive as that offered by Lewis's counsel in Lewis's defense. During the post-trial state and federal habeas proceedings, five eyewitnesses to the shooting provided sworn declarations and/or testimony affirmatively stating that Rios was *not* the shooter. First, Kelvin Wilkins testified in a deposition that he was at the scene on the night of the shooting and was 20–30 feet from Hampton when he was killed. Wilkins stated that he has known Rios since grade school and that the person who shot Hampton was *not* Rios. The shooter, Wilkins stated, was over six feet tall and weighed about 250 pounds, whereas Rios is 5'6" or 5'7" tall and weighs about 185 pounds. When Wilkins learned that Rios was a suspect, he called Rios's sister, Lori, and obtained Castro's phone number. Wilkins called Castro's office and left a message, but Castro never returned his call.

Second, Maurice Warren submitted a declaration stating that he was present on the night in question and saw the shooting. He, too, averred that Rios was *not* the shooter. Warren stated in his declaration that he was a member of the Bloods gang, along with Hampton. Warren could have corroborated the testimony of many other witnesses that Hampton had started fights with people throughout the evening, even before Rios attempted to park in front of the deli. Specifically, Warren would have testified that he, Hampton, and James Barren engaged in a fight with a group of Crips gang members who were present that night. Later, those same Crips gang members returned in a small white car and a small black man wearing a blue hat, a white t-shirt, and blue khakis starting shooting. Warren would have testified that, at the time of the shooting, he saw Rios standing next to a truck across the street and that Rios did not shoot at anyone.

Third, Jason Archie, a close friend of Hampton's who had grown up with him, would have testified that Rios did *not* shoot at Hampton. Archie was at the scene on the night in question and saw Hampton attack Rios in his car. Archie would have testified that he was standing right next to Hampton at the time of the shooting and that he witnessed two men, neither of whom was Rios, shoot Hampton. Both of the men were individuals with whom Hampton and Archie had fought earlier that night—probably the Crips referred to by Warren. The two men pulled out their guns and Archie tried to tell Hampton to "watch out," but it was too late.

Fourth, Alonzo Joseph would have testified that he witnessed the shooting and was about 30 feet away from Rios and 20 feet away from Hampton at the time. Joseph would have testified that Rios did not have a gun and did *not* shoot Hampton.

Fifth, Rose Marie Chapman, originally on the State's witness list, would have testified that she witnessed the shooting and Rios was *not* one of the shooters. Chapman would have testified that she was present that night and saw a black man who was approximately 5'9" tall and weighed approximately 200 pounds drive up in a yellow four-door car and shoot Hampton at least three times with a shotgun. At the same time, she saw a black man with short hair shooting at Hampton. Neither of these individuals, however, resembled Rios.

and thus they support rather than undermine the claim of prejudicial effect.

Thus, there was much strong, unequivocal, exculpatory evidence available to Rios's counsel had he conducted a reasonable investigation. To find Wilkins, Castro would have had to do nothing more than return his phone call. Castro knew about Chapman because she was on the State's witness list. Archie and Warren had gone to the scene that night with Tonya Hayden's cousin, Aaron Reid. Hayden, Taylor, and Parrish all testified that they spent the earlier part of the evening at a party hosted by Reid. Hampton was also at that party. Had Castro investigated Hampton's actions that night, or the actions of the principal prosecution witnesses, he likely would have discovered both Warren and Archie. Rios's state habeas counsel found Joseph before the motion for a new trial was filed, and there is no reason to believe that Castro would not have been able to find him had he conducted a reasonable investigation.

At trial, Antonia Smith was the only defense witness—and she was, of course, a witness for Lewis—who affirmatively stated that she saw the person who fired the shots and that the person was *not* Rios. If Castro had properly investigated the case before trial and discovered the five witnesses whose testimony is discussed above, it is reasonably certain that he would have offered direct evidence in support of a misidentification defense and not merely presented testimony regarding an unconsciousness defense. Significantly, at least two of the five witnesses whose testimony would have exculpated Rios were close friends of the victim, one of them, at least, being a fellow member of the Bloods gang.

Thus, their testimony could have been particularly persuasive.

We cannot say that the State's case against Rios was so strong that the testimony of the five available eyewitnesses Rios's counsel failed to locate (along with that of Antonia Smith) would not have created reasonable doubt in the mind of a reasonable juror. It is possible that the State might still have been able to obtain a conviction by exploiting inconsistencies in the different accounts of the shooting or by convincing the jurors that they should still believe the even more inconsistent testimony of the three young intoxicated women in Rios's car. However, there can be little doubt that the testimony of the five additional witnesses "would have altered significantly the evidentiary posture of the case." *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir.1998); *see also Avila*, 297 F.3d at 920–23; *Lord*, 184 F.3d at 1095–96. Because we conclude that there is a reasonable probability that the testimony of Wilkins, Warren, Archie, Joseph, and Chapman, when coupled with Antonia Smith's testimony, would have caused the jury not to return a judgment of guilty with respect to Rios, our confidence in the verdict has been undermined. At the very least, we find ourselves in "grave doubt" as to the prejudicial nature of Castro's deficient performance. *See Lord*, 184 F.3d at 1096 (holding that reversal is required if we are in "grave doubt" as to harmlessness of an error that affects substantial rights). Thus, we hold that Rios was prejudiced by Castro's failure to conduct a reasonable investigation and that a writ of habeas corpus must be granted.[23]

---

23. Rios also contends that Castro's performance was constitutionally ineffective because he failed to research and present the defense of unconsciousness and failed to investigate whether Rios's drinking and drug consumption precluded a finding of malice.

Assuming without deciding that Rios's performance was constitutionally deficient in both respects, he has not established prejudice. He has failed to come forward with any evidence suggesting that the presentation of different expert testimony on the uncon-

## III. CONCLUSION

Rios's counsel's failure to interview witnesses or otherwise conduct any investigation as to a potential misidentification defense constituted an objectively unreasonable pre-trial investigation. Because there is a reasonable probability that, but for counsel's failure to conduct an adequate pre-trial investigation, the result of Rios's trial would have been different, and because our confidence in the jury's verdict is undermined, we hold that counsel's ineffective performance prejudiced Rios. Thus, Rios was deprived of his Sixth Amendment right to effective assistance of counsel and is entitled to habeas relief. We therefore reverse the district court's dismissal of Rios's federal habeas petition and remand the case to the district court with instructions to grant the writ unless the State of California grants Rios a retrial within a reasonable period of time to be set by the district court.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

FERNANDEZ, Circuit Judge, Dissenting:

It is true, as the majority emphasizes, that attorney Castro initially decided on the unconsciousness defense before he had conducted an extensive investigation. Of course, one does have to start thinking about the proper approach early on,[1] but what is significant is that Castro saw a great deal of information thereafter and saw no reason to change his initial approach. With perfect 20/20 hindsight, we can decide that he should have done more investigation, but that is not the standard.

As it is, Castro's client did not even deny committing the murder,[2] and it was clear that the injured and outraged Rios did plan a murderous assault,[3] returned to the scene of the beating to carry it out,[4] and after the shooting fled the scene and the state. Interestingly enough, during that lengthy flight, which took him as far as Ohio, Rios said, "[w]hy did it have to happen," in response to discovering that Hampton was dead. One can properly assume that it was not a feeling of human empathy for the brute who had beaten him into a state of alleged amnesia that caused the exclamation.[5] Most likely, it was an admission that his revenge had gotten him into a real mess.

Moreover, counsel did not eschew the sciousness defense might have resulted in a different outcome. Moreover, with respect to Castro's failure to investigate Rios's drinking, Rios himself stated that he was not drunk that night, and there is no evidence that Rios blacked out at any point before the shooting due to alcohol. As for the drug consumption, Rios has presented no expert testimony that the amount of drugs he ingested when he shared a cocaine-laced joint with four other people would so adversely affect him as to preclude a finding of malice. Thus, there is no evidence to suggest that, had Castro presented a "diminished actuality" defense on the basis of his use of alcohol and drugs, the outcome of the trial would have been different.

1. Every scientist knows that a person has to construct some sort of screen before he starts sifting for facts. Absent that, no solution will ever be obtained.

2. He said that he remembered nothing. Thus, he offered no help to counsel.

3. Significantly, what Rios said to the people with him was that Hampton was going to get it and the girls were going to see some real men.

4. Surely, Rios was not returning to the scene fully armed in order to have a rational conversation or to play patty-cake with Hampton.

5. After the assault, Rios's eyes were black, his nose was bleeding, his face was swollen, and he was dizzy.

misidentification defense for Rios;[6] in fact, as it came out at trial the evidence showed just as much doubt about Rios as it showed about Lewis. Again, as counsel recognized, there was no real doubt that Rios went back to the scene armed, and fled after the shooting. The witnesses were conflicting among themselves and even with their own prior stories, and all had been drinking. The jury had a good picture of that without the addition of more of the same. Many of the witnesses gave testimony favorable to Rios; they said he did not shoot Hampton. If the jury was going to be moved by that sort of evidence as far as Rios was concerned, it seems that it would have been.[7] It was not, and the evidence against him was, as the state court said, extremely damaging.

Really, in foresight Rios's best hope probably was the mental defense adopted by Castro.[8] In hindsight, of course, it looks as if some defense other than unconsciousness should have been emphasized. Indeed, in hindsight the unconsciousness defense failed, so no other defense could have been worse. But that is not the standard either.

The long and the short of it is that the record did not stun the state courts, the magistrate judge, the district judge, or me into a state of grave doubt. Nor did it leave any of us wandering in a miasma of undermined confidence. On the contrary, Rios failed to show with "probability sufficient to undermine confidence in the outcome" that had his counsel interviewed more witnesses and then chosen to place them on the stand to introduce more conflicting testimony, "the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984); *see also O'Neal v. McAninch*, 513 U.S. 432, 445, 115 S.Ct. 992, 999, 130 L.Ed.2d 947 (1995).

Thus, I respectfully dissent.

---

6. Actually, a fourth of his closing argument was devoted to that defense.

7. The newly dredged up witnesses would simply have added more conflicting stories about who was shooting and from what location. *See Clabourne v. Lewis*, 64 F.3d 1373, 1382 (9th Cir.1995); *United States v. Schaflander*, 743 F.2d 714, 718 (9th Cir.1984).

8. It is true that the jury let Lewis go free, but we can hardly speculate on why it took that path. At any rate, that cuts against Rios rather than for him. It indicates that conflicting evidence from eyewitnesses was not going to save his hide; the jury saw his case differently.