Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRED LAWRENCE ROBINSON,
*Petitioner-Appellant,*

v.

DORA B. SCHRIRO, Director,
*Respondent-Appellee.*

No. 05-99007

D.C. No.
CV-96-00669-JAT

OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued December 6, 2007
Submitted February 19, 2010
San Francisco, California

Filed February 22, 2010

Before: Betty B. Fletcher, Marsha S. Berzon, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge B. Fletcher;
Dissent by Judge Rawlinson

.

---

**COUNSEL**

Patrick E. McGillicuddy, Phoenix, Arizona, for the petitioner-appellant.

Terry Goddard, Attorney General, Kent Cattani, Chief Counsel, Capital Litigation Section, J.D. Nielsen, Assistant Attorney General, and Jeffrey A. Zick (argued), Assistant Attorney General, Capital Litigation Section, Phoenix, Arizona, for the respondent-appellee.

---

**OPINION**

B. FLETCHER, Circuit Judge:

Petitioner Fred Lawrence Robinson appeals the district court's denial of his Petition for Writ of Habeas Corpus. Robinson faces a death sentence imposed by the state of Arizona for the murder of Sterleen Hill. Robinson sought relief from his sentence and conviction on ten grounds in his petition to the district court. Following denial of the petition, the district court granted a certificate of appealability as to four issues, and we subsequently certified an additional five issues for appeal. We have jurisdiction over this pre-AEDPA appeal pursuant to 28 U.S.C. § 1291 and reverse in part and remand in part the district court's determination. We hold that the Ari-

zona courts arbitrarily found that Robinson committed the murder in an especially cruel, heinous, or depraved manner in violation of the Eighth Amendment and that Robinson received ineffective assistance of counsel at sentencing in violation of the Sixth Amendment. We reverse the district court's denial of those claims and remand to the district court for issuance of a writ of habeas corpus striking the application of the especially cruel, heinous, or depraved aggravating factor to Robinson and ordering a new sentencing proceeding. We affirm the district court's denial of Robinson's remaining claims in a memorandum disposition filed concurrently with this opinion.

## I.   Factual and Procedural Background

### A.   The Crime[1]

At around 6 p.m. on June 8, 1987, Robinson drove from Banning, California, to Yuma, Arizona with two friends, Theodore Washington ("Washington") and Jimmy Lee Mathers ("Mathers"). Earlier that afternoon, Robinson told his son, Andre, that the three men were going to Yuma to see if Susan Hill ("Susan"), Robinson's common law wife, was there. As Andre looked on, the three men loaded two handguns and a shot gun into Robinson's car.

At around 11:30 p.m., Sterleen Hill ("Sterleen"), Susan's stepmother, heard sounds outside the Hills' house in Yuma. She told her son LeSean to investigate, but he saw no one. At approximately 11:45, someone knocked on the door. When LeSean opened it, a man identified himself as James and told LeSean that he had some money for Ralph Hill ("Ralph"), Susan and LeSean's father. When LeSean opened the door to accept the money, the man, whom LeSean believed to be a

---

[1]Except as noted, we base our recitation of the facts on the Arizona Supreme Court opinion upholding Robinson's conviction and sentence on direct appeal. *See State v. Robinson*, 796 P.2d 853 (Ariz. 1990).

black man, attempted to grab him. LeSean escaped the man's grasp, fled the house, and ran to a neighbor's house to call the sheriff.

As LeSean fled his house, two people entered the home. One of these was later identified by Ralph as a black man with a red bandana who was not Robinson. Ralph heard the intruders say that they were narcotics agents and that they wanted the drugs and the money. The intruders forced Sterleen and Ralph to lie face-down on the floor of their bedroom and bound their hands and feet with electrical cords and neckties. The intruders repeatedly asked where the money was and searched through the bedroom closet and dresser. When Sterleen asked that her feet be covered up, the Hills were both shot in the back with a shotgun. Ralph survived with severe injuries, but Sterleen died. A girl who lived across the street heard what sounded like gunshots and then heard footsteps on the gravel outside, muffled voices say "hurry up," a car door slam, and a car driving away.

Shortly after the shootings, Deputy Koteles, who was responding to LeSean's emergency call, saw Robinson driving near the Hills' house. When Robinson passed Koteles, Robinson smiled and accelerated as he passed. Robinson was apprehended in his car shortly thereafter on a road near the Hills' home. Deputy Koteles found several bullets in Robinson's pants pockets. Mathers was apprehended the next day after Susan Hill, who had heard about the shooting and was on her way to Yuma after stopping in Banning, saw Mathers walking along the road in the direction of Banning. Washington, who had called his girlfriend at 2:00 a.m. on June 9th to tell her that he was stranded in Yuma, was apprehended in Banning several days later.

Subsequent to the shootings, the police found several pieces of evidence in the fields surrounding the Hill house, including Robinson's shotgun, several spent and unspent shotgun shells, a revolver cylinder, a bag containing several bul-

lets, and a coat that appeared to belong to Washington. The police also found evidence in Robinson's car, including a box of shotgun shells, a red bandana (on which hairs probably belonging to Mathers were found), and a piece of paper with the Hills' address on it, which had probably been written by Robinson.

In front of the Hills' home, the police found footprints which they believed belonged to Robinson, although they did not have a forensic expert evaluate the prints. There was no evidence, however, that Robinson had been inside the home. No fingerprints of his were found inside the house, on the shotgun, or on any other items believed to have been used in the shooting. Moreover, neither LeSean nor Ralph Hill identified Robinson as having been one of the intruders, even though Ralph knew Robinson and was shown a photo lineup containing Robinson's photo.

## B. The Trial

### 1. Guilt Phase

The three men were tried together. The prosecution's theory at trial was that Robinson had recruited Washington and Mathers to go with him to Yuma to kidnap Susan Hill. The prosecution's evidence established that Robinson had brought guns on his trip to Yuma, had been present in front of the Hills' house, and had driven away after the shooting. But the prosecution neither argued nor presented evidence that Robinson entered the residence or participated in the actual shooting. In fact, Ralph specifically testified that the person he saw was not Robinson. Additionally, the prosecution presented no evidence or argument that Robinson had instructed Washington and Mathers to kill the Hills, much less tell them how to do so.

As further evidence of Robinson's motive, the prosecution presented evidence of two other occasions on which Robinson

attempted to get Susan to return to him. The first time, in June 1986, Susan was staying with her sister in North Hollywood, California. Two men entered the house one after the other, threatened Susan's sister and 11-year-old niece with handguns, and tied up their hands with stockings. Approximately two minutes later Robinson entered the house, by which time the niece had already been untied. Robinson had the sister take him to Susan, who was hiding in the bedroom closet. Robinson then cut the stockings off of the sister's hands, told her to return to the living room, and spoke to Susan for about half an hour. During the conversation, Robinson tried to make Susan believe that he missed her and wanted her to come back to him, but he also told Susan that he had come with the intention of killing her and her sister and that the only thing that stopped him was that Susan's niece was there. The next day, Susan left with Robinson for Banning.

The second occasion was in January of 1987, after Susan went to Philadelphia to stay with family without telling Robinson where she was going. When Robinson eventually located her, he went to Philadelphia with Mathers, lured Susan to him through a ruse, grabbed her, and took her back to Banning.

All three defendants were found guilty of first-degree murder, attempted first-degree murder, two counts of aggravated assault, first-degree burglary, and armed robbery.

## 2. Sentencing Phase

The prosecution changed its theory of the case at sentencing. The new theory was that Sterleen died as a result of a drug deal gone bad. Accordingly, the prosecution argued two statutory aggravating circumstances: (1) the defendants committed the offense in expectation of the receipt of something of pecuniary value, and (2) the defendants committed the offense in an especially cruel, heinous, or depraved manner. Additionally, the prosecution specifically argued that the pos-

sibility that the conviction rested upon felony-murder was not a mitigating circumstance in this case because there was no doubt of the defendants' specific intent to kill.

In his sentencing memorandum, Robinson's attorney, Robert Roberson made several arguments. First, Roberson argued that the Supreme Court's opinions in *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), counseled against sentencing Robinson to death because Robinson was not present at the scene of the killing and the prosecution could not show beyond a reasonable doubt that Robinson intended to kill or acted with a reckless indifference to human life. Second, Roberson argued that the prosecution could not prove the statutory aggravating circumstances beyond a reasonable doubt. Third, he argued that two statutory mitigating circumstances applied: (1) that Robinson was a minor participant in the offense, and (2) that it was not reasonably foreseeable that Robinson's conduct would cause or create a grave risk of death to another person. Finally, he briefly argued that Robinson could not be sentenced to death because he was convicted under the felony murder rule. Roberson did not present any non-statutory mitigating factors in his sentencing memorandum.

The court held a single aggravation/mitigation hearing for the three defendants. The prosecution presented several witnesses, including Major Ralph Ogden, chief deputy for the Yuma County Sheriff's office. Ogden testified about statements made to him by Robinson's co-defendant Washington after the arrest, but the Arizona Supreme Court later deemed this testimony inadmissible under the Confrontation Clause.

According to Ogden's second-hand account, Robinson told Washington when they arrived in Yuma that they were going to "knock off a dope dealer, take his coke and take the cash." He also instructed them that after Washington and Mathers had gone up to the house, Washington would knock on the door, and that when somebody opened it, the two men would

enter and "put the people down," meaning "get them in chairs or whatever." At that point, Robinson would enter because he knew where the cocaine and the money were located. According to Ogden, Washington told him that there was no specific plan to kill anybody, but that Mathers was to carry a shotgun and Robinson told his accomplices, "if things get rough, shoot 'em."

Sergeant Roy Brock, also with the Yuma County Sheriff's office, testified at the sentencing phase about statements that Robinson had made to him after the murder. These statements indicated that the purpose of the trip to Yuma was to "rip off" some drug dealers. But according to Robinson, Washington and Mathers drove to Yuma in a different car and went to the wrong house, where they proceeded to commit the crime.[2]

Roberson cross-examined the state's witnesses, but did not call any of his own. In his closing argument, Roberson again focused on the aggravating factors and urged the court to find that the county had not proved the aggravating factors beyond a reasonable doubt. With respect to mitigation, Roberson relied on his sentencing memorandum, making only a brief argument that Robinson "[didn't] have a history of harming people" and was "a good father apparently."[3] Altogether,

---

[2]The county also called Dr. Bruce Shirer, a pathologist who performed the autopsy on Sterleen Hill and had testified at trial. Shirer testified that there was no evidence of head trauma that would indicate that Sterleen had been knocked unconscious; on cross-examination he acknowledged that it was nevertheless possible that she was knocked unconscious shortly before being shot. Ralph Hill testified at the aggravation/mitigation hearing, but his testimony was directed only toward sentencing for the non-capital offenses for which the defendants were convicted.

[3]The following is the full extent of Roberson's closing argument on mitigation:

> I can cite a whole lot of mitigating factors as far as Fred is concerned. I can cite a couple that may have a little bearing. Fred, at least as far as the evidence we have received in court, doesn't have a history of harming people. He may have a history, as

Roberson's closing argument consisted of just over ten pages of double-spaced transcript.

The court sentenced Robinson to death.[4] The sentencing judge found three statutory aggravating factors justifying the sentence: (1) Robinson procured the commission of the offense by the payment or promise of receipt of something of pecuniary value by the other defendants; (2) Robinson committed the offense for the purpose of receipt of something of monetary value; and (3) Robinson committed the offense in an especially heinous, cruel, or depraved manner. With respect to mitigating circumstances the court found that (1) Robinson's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was not impaired; (2) Robinson was not under duress; (3) Robinson was not a minor participant in the crime; (4) it was reasonably foreseeable that the offense would create a grave risk of death; (5) Robinson's age (46 at the time of the mur-

---

shown by the evidence, of going after Susan and being involved in some shenanigans that way, but he never hurt anybody as far as we know by the testimony. He is a good father apparently. He has — I don't remember what the testimony is — 9, 12, 15 kids or something by several different women. He apparently has custody of almost all of them. Even Susan had to testify Fred was a good father. The kids loved him. They were taken care of, fed, clothed, sent off to go to school. The kids testified about having to go to school, getting homework done. They had newspaper routes. I don't think we can show Fred is some kind of ogre who is a total — and has no redeeming value. I think from the fact he was able to raise, from what I could see from testimony, 2 pretty good kids and presumably the other children just as well as those 2. He is able to care for them. He is able to. They love him. I think that's a little mitigation for him.

[4]Under Arizona law at the time of Robinson's sentencing, the trial judge, not the jury, determined whether aggravating circumstances applied. Although the Supreme Court invalidated this sentencing scheme in *Ring v. Arizona*, 536 U.S. 584 (2002), *Ring* does not apply retroactively to cases on collateral review. *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

ders) was not a mitigating factor; and (6) "no other mitigating circumstances were presented by the defendant for consideration." Because the trial court found at least one statutory aggravating circumstance and no mitigating circumstances, it was bound under then-existing Arizona law to apply the death penalty. *See* Ariz. Rev. Stat. 13-703(E) (1988) (current version at Ariz. Rev. Stat. § 13-751).

## C. State Appeals and Federal Habeas Corpus Review

### 1. Direct Appeal

All three defendants appealed their convictions and sentences. The Arizona Supreme Court vacated Mathers's conviction, *State v. Mathers*, 796 P.2d 866 (Ariz. 1990), but upheld the convictions of Robinson and Washington, *State v. Robinson*, 796 P.2d 853 (Ariz. 1990). Before the Arizona Supreme Court, Robinson argued that various evidentiary rulings in the trial court were in error and that his sentence should be vacated because "(1) the killing was not committed for pecuniary gain, (2) the killing was neither depraved nor heinous, nor was it cruel, and (3) a further hearing was required regarding the presence of *Tison* and *Enmund* considerations." *Id.* at 858. Although it upheld Robinson's sentence, the court held that only two of the three aggravating circumstances found by the sentencing court were supported by the evidence. *Id.* at 861-63. The court held that the testimony of Major Ogden as to the statements made to him by Washington was inadmissible because it violated Robinson's Sixth Amendment right to confront a witness against him. *Id.* at 861-62. As a result, the court set aside as insufficiently supported the sentencing court's finding that Robinson committed the murder in expectation of something of pecuniary value. *Id.* at 862. As for mitigating circumstances, the court stated, "Robinson offered no mitigating circumstances and we agree with the trial court that none exist."[5] *Id.* at 863. As a

---

[5]As explained above, Robinson's counsel did in fact argue very briefly for two statutory mitigating circumstances and two nonstatutory mitigating

result, the court held that "no mitigating circumstances exist so as to warrant vacating . . . Robinson's . . . death sentence[ ]." *Id.* at 864. The court also concluded that "imposition of the death penalty in the present case is proportional to the sentences imposed in similar cases," and that the district court did not commit fundamental error. *Id.* at 865.

## 2. State Post-Conviction Relief Proceedings

Robinson then brought a petition for post-conviction relief in Arizona state court, making the same arguments that he made on direct appeal and adding a claim for ineffective assistance of counsel. The same superior court judge who presided over Robinson's trial also presided over Robinson's post-conviction proceedings. The court conducted an evidentiary hearing on the ineffective assistance of counsel claim. The court heard testimony from Juan Gonzales, a corrections parole officer; Robert Roberson, Robinson's trial counsel; and Dr. Tod Roy, a psychologist who examined Robinson in preparation for the evidentiary hearing.

### a. Gonzales

Gonzales's testimony focused on Robinson's good behavior in prison. Gonzales testified that Robinson had frequent contact with members of his family, both by mail and by telephone. Gonzales also testified that Robinson had only two minor disciplinary problems in four years and was classified as Level Five-One, the lowest security level possible for a death row inmate, "which means . . . they do what they are told and never get in trouble." Gonzales testified that Robinson was an insulin-dependent diabetic and that he got along well with other inmates, went to church regularly, and had

circumstances. That the Arizona Supreme Court wrongly believed that Robinson had offered no mitigating circumstances accentuates only the feebleness and brevity of counsel's effort.

adjusted well to life in prison. Gonzales believed that Robinson would do well if he were placed in the general prison population.

### b.   Roberson

Roberson testified about his educational and professional background and about his preparation for the guilt and penalty phases of the trial. At the time of the evidentiary hearing, he had been practicing for about twenty years, splitting his time more or less equally between criminal and civil work, and thought, although he was not sure, that he had tried at least one death penalty case prior to Robinson's. He explained that after being assigned to Robinson's case, he stopped taking new civil matters so that he would have more time for Robinson. He did not apply for funds for a private investigator, noting that "back during those days we were all doing pretty much our own investigation."[6] Likewise, he did not hire medical or mental health experts, stating that he never observed any mental deficiencies, that Robinson never "gave [him] any indication that there was some mental problem that he might like to explore," and that he never got "any inkling" that there was "any kind of a mental problem or psychological explanation . . . that might have led to Fred's involvement in this case."

Turning specifically to the penalty phase, Roberson acknowledged that any type of mitigating evidence could be presented at sentencing, not just the five statutory circumstances, and that the nonstatutory factors included potential for rehabilitation, remorse, and family ties. He also acknowledged that the full extent of his investigation was talking to Robinson, and he explained that he did not feel that he could present evidence of remorse or family ties because Robinson insisted he was innocent and two of his sons had testified

---

[6]The court agreed that "it was rather rare for the court either to hear or grant a request for outside investigators."

against him. He acknowledged that he did not subpoena school, medical, mental, or employment records for Robinson, but did not provide any explanation for why he did not do so. He acknowledged that in hindsight he should have consulted a psychologist or psychiatrist, but said that at the time he did not think it was necessary based on what Robinson had told him. Finally, he acknowledged that he did not call any witnesses on Robinson's behalf.

### c. Roy

Dr. Roy testified as to the results of his psychological evaluation of Robinson. In preparing his report, Roy conducted fourteen hours of face-to-face interviews and testing with Robinson and interviewed Robinson's father.

Roy described a "number of experiences in [Robinson's] development that I think contributed to how he viewed people[, e]specially in close relationships." These included repeated childhood sexual abuse, the repudiation of Robinson's siblings by his father, and physical and emotional abuse by his father and stepmother.

According to Roy's report, Robinson was born and spent his formative years in a poor, segregated rural community in Texas. He described his childhood as close knit until his parents separated when he was nine or ten. His parents' divorce was particularly difficult for Robinson because his father rejected the younger children in open court and the children were separated. Robinson and the older siblings went to live with his father, and the younger siblings stayed with his mother.

Shortly after the divorce, Robinson's father remarried. His new stepmother had five children of her own and they all lived in a very small house. Robinson felt that he and his biological siblings were treated worse than his step-siblings; for example, the step-siblings ate meals first and Robinson and

his siblings ate the leftovers. Robinson reported being beaten with a switch or a belt approximately every other day for minor infractions reported by his stepmother. Things improved when the family moved to a larger house, although there was still conflict. In particular, when Robinson was in high school he worked to save money for a car; not twenty-four hours after he purchased it, his father told him that he and Robinson's stepmother had decided that Robinson would have to give his car to an older stepbrother who in their estimation needed it more because he was going to college. Robinson continues to resent his father for doing this, although he says he forgave him.

Robinson also experienced several incidents of sexual abuse. First, his stepmother's boyfriend sodomized him at knifepoint and threatened him with death if he told anyone. Second, when he was about nine years old, he witnessed his sister being raped by a white man. Finally, as a young boy he had an aunt who repeatedly performed oral sex on him and forced him to do the same to her. Dr. Roy remarked at the evidentiary hearing that Robinson "was tearful and very reluctant to talk about [the rape]. And it was my impression that I was the first person to whom he had disclosed that." Roy described the significance of this type of incident to a child:

> It's significant because — especially a rape of that nature — it brings very quickly to one's awareness how powerless one is over the power of someone else, for one. And I believe his life was threatened if he told anyone. One's achievement, one's desire to do things can be robbed when arbitrarily they are taken from us, and for reasons that aren't reasonable and questionable entitlement. That would leave an individual with — who was somewhat confused, in terms of what to expect. It would also create a sense of dependency on these people, because they are the ones that have the power, and that power sometimes is utilized in inappropriate ways.

At the time of his conviction, Robinson had been unemployed and receiving disability benefits for approximately seven years. He became disabled as a result of a motorcycle accident which left him with a pronounced limp. Robinson also claimed that he suffered a head injury as a result of the accident, but according to Roy, Robinson's medical records after his accident "did not report any disturbances that would suggest organic brain damage."

Robinson has a very large family. In addition to seventeen siblings, he reported having fifteen children of his own with five different women. Several of these relationships ended or had problems because the women were cheating on him.

Robinson claims never to have used drugs. At the time of his conviction, he had numerous health problems, including diabetes, high-blood pressure, a broken hip, and poor vision. He had never been evaluated or treated by a mental health care provider until his post-conviction relief evaluation.

Roy diagnosed Robinson with Adjustment Disorder with Anxious Mood (Axis I) and Borderline Personality Disorder with Dependent Features (Axis II), a character disorder that leads to a pattern of unstable relationships because of the psychological defense mechanisms of its sufferers. Roy concluded in his report that Robinson's character disorder resulted from his caretakers' disregard for him and his efforts.[7]

At the hearing, Roy testified that Robinson "had the potential to be rehabilitated," although there were concerns about the likelihood in light of his age and disability. He also stated that there was a "lack of . . . data to support a hostility towards people." He found that Robinson had low intelligence, scoring an I.Q. of 81,[8] which is at the tenth percentile

---

[7]This diagnosis was challenged by the state's expert, Dr. Eva McCullars, who based her contrary diagnosis of Anti-Social Personality Disorder on her review of Roy's report and a brief interview with Robinson.

[8]An I.Q. of 75 is considered mentally retarded.

of adults, meaning his intelligence "would be exceeded by ninety percent of the adult population of this country." Dr. Roy also stated that he did not believe that Robinson had a predisposition or propensity towards violence, and that there was no risk of recidivism, although he said that he would recommend Susan stay away from him, because this crime "seems to be strictly related to the dynamics in that relationship [with Susan Hill] in his own psychology."

The court ultimately denied Robinson's petition in its entirety. With regard to Robinson's challenge to the application of the especially cruel, heinous, or depraved conduct aggravator, the court stated that "[n]othing has been presented here except a reiteration of the sentencing proceedings and findings of this court which were later reviewed and upheld on appeal," which did not "present a colorable claim."

The court was similarly unconvinced regarding Robinson's claim of ineffective assistance of counsel. The court found that Roberson was not ineffective at sentencing because (1) "[i]t was pretty much apparent that the defendant's family was not going to be the source of much mitigating testimony"; (2) evidence that Robinson was "a good and caring father" was balanced by evidence of Robinson's "aggressive and tyrannically possessive attitude concerning his 'family,' " including Susan Hill; and (3) there was no evidence that Robinson was "a minor player in the crime[.]" The court also found that Roberson was not ineffective in failing to request a psychological evaluation. The court accepted as true the finding that Robinson had "an antisocial personality disorder and was poorly adjusted to living in society," but found that there was nothing which would have "lessened his ability to differentiate right from wrong or to conform his actions with the law" at the time the murder was committed. The court also noted that there was nothing that would have suggested to Roberson that a mental examination would be helpful to Robinson. The court concluded that the results of Dr. Roy's examination would not have "altered the sentence imposed."

Finally, the court rejected all of Robinson's claims of mitigating circumstances.

The Arizona Supreme Court subsequently denied Robinson's petition for review without opinion.[9]

### 3.    Federal Habeas Corpus

Robinson filed a preliminary habeas petition on March 14, 1996, in which he requested relief on ten grounds and sought appointment of counsel. Counsel was appointed and on May 6, 1997 an amended petition was filed. Robinson's amended petition made nine claims for relief: (1) ineffective assistance of counsel based on his attorney's conflict of interest; (2) a due process violation based on the trial court's refusal to give a requested lesser included offense instruction; (3) the "procurement for pecuniary gain" aggravating circumstance was unconstitutionally vague; (4) the prosecution's inconsistent motive theories violated his Fourteenth Amendment rights; (5) a violation of his Eighth and Fourteenth Amendment rights because the Arizona Supreme Court failed to conduct a harmless error analysis or re-weigh aggravating and mitigating circumstances; (6) the application of the "especially heinous, cruel or depraved" aggravating circumstance to facts of this case violated the Eighth and Fourteenth Amendments; (7) a violation of his Eighth and Fourteenth Amendment rights because there was insufficient evidence that he killed, attempted to kill, or intended to kill; (8) ineffective assistance of counsel at sentencing; and (9) Arizona's execution statute violated the ex post facto clause and the Fourteenth and Eighth Amendments.

On August 8, 1999, the district court issued an order dis-

---

[9]Robinson filed a Second Petition for Post Conviction Relief in Arizona Superior Court on February 10, 1998. The state trial court denied the petition and the Arizona Supreme Court denied the petition for review. Robinson's second petition is not at issue in this appeal.

missing Claims 1, 2, 3, 4, and 6-A as procedurally barred and Claim 9 as withdrawn, and ordering briefing on the merits of the remaining issues. On March 17, 2005, the district court denied relief concluding that Claim 5 was procedurally barred and that Claims 6-B, 6-C, 7 and 8 lack merit. The court also concluded that Robinson was not entitled to an evidentiary hearing in district court on ineffective assistance of counsel. The district court granted a certificate of appealability on Claims 6-A, 6-B, 6-C, and 8. We subsequently granted a certificate of appealability on Claims 1, 2, 3, 4, and 5.

## II.    Standard of Review

We review the district court's denial of Robinson's habeas petition de novo, and the district court's findings of fact for clear error. *See Rios v. Rocha*, 299 F.3d 796, 799 n.4 (9th Cir. 2002). Because Robinson's federal habeas petition was filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, pre-AEDPA law governs our consideration of the merits. *Correll v. Ryan*, 539 F.3d 938, 941-42 (9th Cir. 2008) (citing *Lindh v. Murphy*, 521 U.S. 320, 327 (1997)), *cert. denied sub nom. Schriro v. Correll*, 129 S. Ct. 903 (2009); *Jeffries v. Wood*, 114 F.3d 1484, 1494 (9th Cir. 1997) (en banc). Under pre-AEDPA law, we owe no deference to the state court's resolution of questions of law or mixed questions of law and fact. *See Williams v. Taylor*, 529 U.S. 362, 400 (2000). Whether Robinson's trial counsel was ineffective is a mixed question of law and fact reviewed de novo. *Summerlin v. Schriro*, 427 F.3d 623, 628 (9th Cir. 2005) (en banc) (citing *Rios*, 299 F.3d at 799 n.4). We review the district court's findings of fact for clear error. *Lambright v. Schriro*, 490 F.3d 1103, 1114 (9th Cir. 2007) (per curiam), *cert. denied*, 128 S. Ct. 882 (2008). Dismissals based on procedural default are reviewed de novo. *Vang v. Nevada*, 329 F.3d 1069, 1072 (9th Cir. 2003).

## III. Discussion

In this opinion, we consider whether the Arizona state courts arbitrarily and capriciously applied the aggravating circumstance of especially cruel, heinous or depraved conduct to Robinson and whether Robinson received ineffective assistance of counsel at sentencing. Because we decide both issues in Robinson's favor, we reverse the district court.

### A. Claim 6: Especially Cruel, Heinous, or Depraved Aggravating Factor

In his federal habeas petition, Robinson argued that the especially cruel, heinous, or depraved aggravating factor, Ariz. Rev. Stat. § 13-703(F)(6) (1988), was unconstitutional as applied to him. The district court divided this claim into three parts:

> (A) Insufficient evidence that Petitioner intended or reasonably foresaw the victim's suffering resulted in an arbitrary cruelty finding in violation of Petitioner's rights under the Eighth and Fourteenth Amendments;

> (B) Insufficient evidence of Petitioner's involvement in the crime resulted in an arbitrary heinous/depraved finding in violation of Petitioner's rights under the Eighth and Fourteenth Amendments;

> (C) The (F)(6) aggravating factor, as applied to Petitioners case, failed to sufficiently channel the sentencer's discretion in violation of the Eighth and Fourteenth Amendments.

The district court rejected claim 6-A as procedurally defaulted. Following briefing on the merits of the remaining claims, the district court concluded that sufficient evidence supported the state courts' findings that the murder was sense-

less and the victim helpless, and as a result, that the depravity prong of the aggravating factor properly applied to this case. But the court went on to note that even if the depravity finding was unconstitutional, the error was harmless because the state courts' cruelty finding was sufficiently supported by the evidence to apply the aggravating factor to Robinson. The court also denied Claim 6-C on the merits. We hold that both Claims 6-A and 6-B were adequately exhausted and entitle Robinson to relief. As we hold that the especially cruel, heinous, or depraved aggravating factor was unconstitutionally applied to Robinson pursuant to Claims 6-A and 6-B, we do not reach Claim 6-C.

### 1.  Procedural Bar

**[1]** The procedural bar doctrine is a subcategory of the independent and adequate state ground doctrine. *See Boyd v. Thompson*, 147 F.3d 1124, 1126 (9th Cir. 1998). The purpose of the doctrine is to protect the state's interests by giving it the opportunity to correct its own errors. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Under this doctrine, a federal court ordinarily will not review a state court ruling if the state court would find that the claim was barred pursuant to an independent and adequate state procedural rule.[10] *Id.*

We recognize two types of procedural bars: express and implied. An express procedural bar occurs when the petitioner has presented his claim to the state courts and the state courts have relied on a state procedural rule to deny or dismiss the claim. An implied procedural bar, on the other hand, occurs when the petitioner has failed to fairly present his claims to the highest state court and would now be barred by a state

---

[10]The federal court, however, will review the claim if the petitioner can show either cause and prejudice, *see Coleman*, 501 U.S. at 750, or a fundamental miscarriage of justice, *see Murray v. Carrier*, 477 U.S. 478, 495 (1986), or if the government waived the procedural default, *see Franklin v. Johnson*, 290 F.3d 1223, 1230, 1233 (9th Cir. 2002).

procedural rule from doing so. *See, e.g.*, *Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002).

The district court concluded that Claim 6-A was subject to an implied procedural bar because it was substantially different from the cruelty issue raised on direct appeal, and Arizona Rule of Criminal Procedure 32.2(a)(3) would prohibit Robinson from returning to state court to exhaust the claim. We disagree with the district court's conclusion that Claim 6-A was not exhausted in Robinson's direct appeal of his conviction to the Arizona Supreme Court and conclude, as a result, that no implied procedural bar applies.

**[2]** In order to exhaust his claim, Robinson was required to present both the factual and legal basis for the claim to the state court. *Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999); *see also Gray v. Netherland*, 518 U.S. 152, 162-63 (1996). To do so, Robinson was required to reference specific provisions of the federal constitution or cite to federal case law and to provide a statement of the facts that entitle him to relief. *Gray*, 518 U.S. at 162-63; *Lyons v. Crawford*, 232 F.3d 666, 668, 670 (9th Cir. 2000), *amended*, 247 F.3d 904 (9th Cir. 2001).

In the Opening Brief he filed on direct appeal of his conviction to the Arizona Supreme Court, Robinson argued that "the imposition of the death penalty was in violation . . . of the Constitution of the United States" because the especially cruel, heinous, or depraved aggravating factor was applied in an arbitrary manner. In support of his position, Robinson cited *Jeffers v. Ricketts*, 832 F.2d 476 (9th Cir. 1987), *rev'd sub nom. Lewis v. Jeffers*, 497 U.S. 764 (1990).[11] In *Jeffers*, we

---

[11]The fact that the Supreme Court later held that the aggravating circumstance was not applied in violation of Jeffers' constitutional rights, *Jeffers*, 497 U.S. 764, does not change the analysis. The citation to *Jeffers* is relevant to this discussion because it put the state court on notice that Robinson was arguing that his sentence violated the federal constitution. Moreover, at the time Robinson's appeal was decided, the Ninth Circuit opinion in *Jeffers* had not yet been overruled.

held that the especially cruel, heinous, or depraved aggravating factor was applied arbitrarily to Jeffers, in violation of the Eighth and Fourteenth Amendments, because there was no principled way to distinguish Jeffers's conduct from that in other cases where the Arizona courts had found that the behavior at issue was not especially heinous or depraved.[12] *Id.* at 483-85. In addition, Robinson argued that the murder was not especially cruel because it did not involve "the senseless or sadistic infliction of great pain" and pointed out that he was not in the house and did not participate in the actual shooting.[13]

The district court erred by concluding that, in his direct appeal of his conviction to the Arizona Supreme Court, Robinson did not fairly present a claim based on lack of intent or foreseeability. Robinson argued that "the finding that his acts constituted especially cruel, heinous and depraved activity is unconstitutional," citing to *Jeffers* in support. Two pages later, he again asserted that "the imposition of the death penalty in this case was arbitrary and capricious and, therefore, unconstitutional." As part of this same discussion in his brief, he also fairly presented the factual basis for his claim, stressing that "[he] was not even in the house and had no part in the actual shooting." Earlier in his brief, while arguing against application of especially cruel, heinous, or depraved factor, he

---

[12]The Arizona Supreme Court had previously held that Jeffers did not commit the murder in an especially cruel manner. *Jeffers*, 832 F.2d at 483.

[13]Robinson's briefing in the direct appeal of his conviction to the Arizona Supreme Court argued that application of the especially cruel, heinous, or depraved factor was unconstitutional because (1) there was no evidence that Sterleen Hill suffered, and (2) there was no evidence Robinson participated in the murders. It is specious to assert, as the dissent does, that Robinson now agrees that Mrs. Hill suffered sufficiently to support a cruelty finding. Further, Robinson's two arguments against application of the especially cruel, heinous, or depraved factor are independent of each other. Even if Robinson had abandoned the first argument about Mrs. Hill's suffering we fail to see why — as the dissent seems to suggest — abandoning that argument would mean that he never made the second argument about his participation.

had already "noted that [he] did not participate in the killing, did not intend anyone to die," and "was not involved directly with the shooting." These arguments clearly exhausted the federal claim.

Robinson was not required to present his arguments in the same amount of detail to the two courts in support of his federal constitutional claim; he was required only to present to the state court the legal and factual basis of his federal constitutional claim. Robinson clearly raised the constitutional issue by citing to a federal case that held that the application of the especially cruel, heinous, or depraved aggravating factor to the petitioner violated the Eighth and Fourteenth Amendments of the U.S. Constitution. He also specifically noted his lack of participation in the shooting in support of his claim. He thus presented the same claim he does now — that, given his lack of participation in the murder, a finding of especial cruelty, heinousness and depravity violated his rights.

It does not matter that Robinson now cites an intervening case, *State v. Carlson*, 48 P.3d 1180 (Ariz. 2002), for the specific holding that the cruelty prong of the "especially cruel, heinous, or depraved" factor may not be applied to a defendant absent intent or reasonable foreseeability. *Carlson* postdates both Robinson's direct appeal and his amended federal habeas petition, so he could not have cited it. More importantly, Robinson's state-court argument was that the "especially cruel, heinous, or depraved" factor *as a whole* could not be constitutionally applied to him because there was no evidence of intent or reasonable foreseeability. His argument, therefore, encompassed the rule that the Arizona Supreme Court specifically adopted in *Carlson*.[14]

---

[14]The dissent distorts the argument Robinson made in his briefing on direct appeal of his conviction to the Arizona Supreme Court. There he articulated the "especially cruel, heinous, or depraved" factor as a *single* factor under Arizona law (as of course it is).

**[3]** This is not a case where the petitioner failed to make clear that he was invoking a federal right, *see, e.g.*, *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam), or where the petitioner's "general appeal to a constitutional guarantee" was too vague to put the state court on notice of the federal claim, *cf. Shumway v. Payne*, 223 F.3d 982, 988 (9th Cir. 2000) (holding that mere reference to "due process" and citation to a state law case that referenced the federal constitution for a proposition other than that for which the case was cited to the

---

The dissent strains to impose a rigid separation on the arguments in Robinson's Arizona Supreme Court briefing, insisting that every time Robinson argued his lack of participation and intent, he intended it to relate only to the heinousness and depravity prongs of the factor but not to the cruelty prong. This interpretation is untenable. The two prongs are discussed together, in a section of Robinson's brief headed "Factor 6 of A.R.S. 12-703F." Though Robinson makes one argument — regarding the extent of the suffering of the victims — that is directed to the cruelty prong only, he ends this section of the brief with a final "not[e]" about Robinson's lack of participation or intent, concluding that paragraph with the statement, "Neither the conduct of the others involved, much less Appellant Robinson's, prove *this factor* beyond a reasonable doubt." (Emphasis added.) In the next section of the brief, in the course of discussing two relevant Supreme Court decisions, Robinson expanded on the facts demonstrating lack of intent and foreseeability. Contrary to the dissent's suggestion, the fair reading of the state court briefing is that Robinson argued that the "especially cruel, heinous, and depraved" factor *as a whole* was unconstitutionally applied in light of Robinson's lack of participation in the killings.

That Robinson's current arguments elaborate on those made in state court does not make his state-court presentation insufficient for purposes of exhaustion. In concluding otherwise, the dissent ignores governing law and substitutes an exhaustion standard that is wholly unsupported in the case law. It fails to understand that as long as the "ultimate question for disposition" has remained the same in state and federal court, as it has here, "variations in the legal theory or factual allegations urged in its support" are entirely legitimate. *Picard v. Connor*, 404 U.S. 270, 277 (1971) (quotation marks and citation omitted); *accord Lopez v. Schriro*, 491 F.3d 1029, 1040 (9th Cir. 2007); *McKinney v. Artuz*, 326 F.3d 87, 97 (2d Cir. 2003); *Boyko v. Parke*, 259 F.3d 781, 788-89 (7th Cir. 2001); *Weaver v. Thompson*, 197 F.3d 359, 364-65 (9th Cir. 1999).

state court was insufficient to put the state court on notice of the federal claim). Robinson alleged violation of a narrow and specific constitutional guarantee — the right to be free from the arbitrary application of an aggravating factor, leading to the arbitrary imposition of the death penalty — and cited a federal court case, *Jeffers*, that held that right was violated because of the way in which the especially cruel, heinous, or depraved factor was applied to the petitioner in that case. He also alleged the factual basis for the claim: the manner of the murder and specifically his lack of participation in the shooting. This combination was sufficient to present the bases of his federal claim to the state court. Accordingly, we hold that Robinson exhausted the claim in state court.

**[4]** Because Robinson exhausted this claim in the state court, federal court review is barred only if the Arizona Supreme Court relied on a violation of a state procedural rule in rejecting the claim. *See Harris v. Reed*, 489 U.S. 255, 261-62 (1989). In this case, the state supreme court, on direct appeal, rejected the claim on the merits. *State v. Robinson*, 796 F.2d at 858. Accordingly, we are not procedurally barred from reviewing Robinson's claim. *Cf. Vasquez v. Hillery*, 474 U.S. 254, 260 (1986) (addressing merits of claim after determining that additional facts did not change substance of claim addressed by California Supreme Court).

## 2. Merits of Claims 6-A and 6-B

Robinson asserts that insufficient evidence supported the Arizona Supreme Court's application of the especially cruel, heinous, or depraved aggravating factor. To be applied to a defendant, an aggravating factor must be proved beyond a reasonable doubt. *Summerlin*, 427 F.3d at 642. Federal habeas corpus relief does not lie for mere errors of state law, but only for federal constitutional violations. *Jeffers*, 497 U.S. at 780. Therefore, to grant habeas relief on an insufficient evidence claim we must conclude that the sentencing court's finding that the murder was committed in an especially heinous,

cruel, or depraved manner beyond a reasonable doubt was not only erroneous, but "was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." *Id.* In making such a determination, the applicable standard of review is that of the "rational factfinder." *Id.* at 781; *see also Martinez-Villareal v. Lewis,* 80 F.3d 1301, 1307 (9th Cir. 1996). This means that "[a] state court's finding of an aggravating circumstance in a particular case — including a *de novo* finding by an appellate court that a particular offense is 'especially heinous . . . or depraved' — is arbitrary or capricious if and only if no reasonable sentencer could have so concluded." *Jeffers*, 497 U.S. at 783. Furthermore, as the especially heinous, cruel, or depraved factor is framed in the disjunctive, we must individually determine that the sentencing court's finding of both cruelty and heinousness and depravity were arbitrary to find that the application of the factor constituted a constitutional violation. *See State v. Gretzler,* 659 P.2d 1, 10 (Ariz. 1983).

**[5]** The cruelty prong of the aggravating factor "relates to the physical and mental suffering of the victim during the murder." *State v. Carlson*, 48 P.3d 1180, 1191 (Ariz. 2002). By contrast, "heinousness and depravity focus on the mental state of the defendant." *Id.* Robinson's challenges to application of both the cruelty and the heinousness and depravity prongs fundamentally run parallel. At bottom, Robinson asserts that the state courts' application of both prongs of this factor was arbitrary because there is no admissible evidence that Robinson was present at, intended, or reasonably foresaw the murders. We agree. Applying the especially cruel, heinous, or depraved factor to Robinson based on the manner of a murder he neither intended, was present for, nor anticipated with reasonable certainty, is an application of Arizona law so arbitrary as to constitute an Eighth Amendment violation.

**[6]** Our review of the record reveals no admissible evidence or argument placing Robinson inside the Hills' home at the time of the murder or evidence tending to prove that Rob-

inson ordered the murder of the Hills. The prosecution never argued, nor was any evidence presented, that Robinson entered the Hills' home and was present for, let alone personally performed, the murder. The evidence shows, and the prosecution argued, only that Robinson drove Mathers and Washington with firearms to the Hills' home and was present outside the residence when the murder occurred. Nor was any admissible evidence presented that Robinson ordered the tying up or murder of the Hills. Major Ogden's statements supporting such a conclusion were deemed inadmissable by the Arizona Supreme Court. Although there was evidence that a year earlier Robinson had entered Susan's sister's house in search of Susan after two of Robinson's associates had first entered the house with guns and tied up Susan's sister and niece, Robinson did not harm anyone on that occasion and there was no evidence that Robinson had instructed his associates to tie up Susan's sister and niece. Hence, the total evidence here at most indicates that Robinson formulated and initiated a plan to have Mathers and Washington invade the Hills' home to locate Susan or drugs, not any plan to bind and murder the Hills.

[7] The Arizona Supreme Court's findings on appeal reflect the lack of evidence of Robinson's presence at or ordering of the murder. While it found Washington "was at least present in the Hills' home" when the murder occurred, it found only that Robinson "loaded firearms into his vehicle in preparation for the trip" and "masterminded the trip." *Robinson*, 796 P.2d at 864.[15] The court, however, did not make

---

[15]We note that, although the jury found Robinson guilty of first degree murder, attempted first degree murder, burglary in the first degree, armed robbery, aggravated assault causing serious physical injury, and aggravated assault using a deadly weapon, this verdict did not require the jury to find that Robinson entered the Hills' home. The jury was instructed both as to felony murder and accomplice liability and found both Mathers and Washington guilty of the same offenses. Either a felony murder or accomplice theory allowed the jury to impute guilt to Robinson through the actions of Mathers and Washington.

any specific finding that Robinson ordered the binding or killing of the Hills. Despite the lack of findings on these critical points, the court relied on the specific manner in which Sterleen's murder was carried out to uphold the especially cruel and heinous or depraved aggravating factor. This was an arbitrary application of state law.

**[8]** "There is no vicarious liability for cruelty in capital cases absent a plan intended or reasonably certain to cause suffering. The plan must be such that suffering before death must be inherently and reasonably certain to occur, not just an untoward event." *Carlson*, 48 P.3d at 1193. To apply "[m]ere foreseeability as a benchmark for death in capital cases would not permit the aggravators to serve their constitutional purpose of narrowing the class of first-degree murderers who can be sentenced to death." *Id.* at 1192.[16] In holding that Sterleen's murder was proved beyond a reasonable doubt to be especially cruel, the Arizona Supreme Court relied on the evidence that Sterleen was bound and witnessed the shooting of her husband prior to her murder, causing her mental suffering. *Robinson*, 796 P.2d at 863. As there was no evidence and the court made no finding that Robinson was present at the time of the murder, to support a cruelty finding the court was required to address whether Robinson in any way intended or anticipated the manner of Sterleen's murder.[17] The court did

---

[16]While the Arizona Supreme Court decision in *Carlson* clarifying the degree of foreseeability necessary to impute cruelty to a defendant was not announced until after Robinson's sentence became final, as a substantive rule it applies retroactively to Robinson's petition. *See State v. Towery*, 64 P.3d 828, 831 (Ariz. 2003).

[17]We agree with the dissent that Robinson's absence "does not give him a pass on culpability," *post* at 2762, but it does require that there be evidence that he intended or anticipated not only the murder but the manner of the murder before the "cruelty" prong may be applied. Thus, in *State v. Dickens*, cited by the dissent, the defendant, though absent, told the gunman by walkie-talkie that he should leave no witnesses, knowing full well his accomplice would murder the witnesses brutally. 926 P.2d 468, 474-75, 491-92 (Ariz. 1996). Here there was no evidence that even intimates that kind of intent or direction.

not even address foreseeability.[18] This failure to apply a constitutionally necessary narrowing principle of state law in applying an aggravating factor is clearly arbitrary, and so a violation of the Eighth Amendment.

[9] Had the Arizona Supreme Court addressed foreseeability, it could not have rationally found Sterleen's death, let alone its manner, foreseeable with reasonable certainty under state law. The Arizona Supreme Court's decision in *State v. Carlson*, which similarly involved a murder committed by accomplices outside of the presence of the defendant, wholly precludes any rational factfinder from imputing the manner of Sterleen's murder to Robinson. Unlike the evidence before us here, the evidence in *Carlson* made clear that the defendant ordered the killing of the victim by two accomplices whom she drove and let in to the victim's apartment. *Carlson*, 48 P.3d at 1185. Once in the apartment, one of the accomplices stabbed the victim multiple times with his eyes closed. *Id.* The court nonetheless held that "cruelty was not properly found" because the defendant "did not plan how the murder would be committed and could not have known that Dan would bungle it by closing his eyes while he repeatedly stabbed Lynne." *Id.* at 1193. As in *Carlson*, there is no admissible evidence that Robinson was present at the murder or planned for the manner of the murder's execution. Indeed, there is no evidence Robinson planned that the murder be committed at all. Furthermore, as in *Carlson*, there is no basis to conclude that Robinson's home-invasion plan was reasonably *certain* to cause death, let alone death following suffering. Robinson

---

[18]The Arizona Supreme Court did find, in dismissing Robinson's *Edmund/Tison* claim not on appeal before us, that Robinson acted with "reckless indifference to human life." *Robinson*, 796 P.2d at 864. This finding does not address the inquiry we are concerned with here: whether Robinson acted with a reasonable certainty that Sterleen Hill specifically would be murdered in an especially cruel manner. The fact that Robinson acted with a reckless indifference to human life generally does not tell us whether his actions had a reasonable certainty of causing Sterleen Hill's murder to occur and occur in the manner it did.

could not have foreseen with any certainty that his accomplices would "bungle" the home invasion and murder Sterleen in the manner they did. The Arizona Supreme Court made no finding to that effect. The murder here, like that in *Carlson*, is a near-textbook example of the type of unforeseen event that Arizona courts may not constitutionally rely on to support a finding of cruelty. We hold that the Arizona Supreme Court here acted arbitrarily.

**[10]** We also hold that Robinson's lack of personal participation in the murder renders the sentencing court's application of the heinous or depraved factor arbitrary. Unlike cruelty, a finding of heinousness or depravity depends on the defendant's state of mind. *See Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1308 (9th Cir. 1996); *State v. Newell*, 132 P.3d 833, 849 (Ariz. 2006); *State v. Moody* , 94 P.3d 1119, 1167 (Ariz. 2004); *Carlson*, 48 P.3d at 1191. "The court looks to a defendant's words and actions at or near the time of the offense to determine a defendant's state of mind" for purposes of finding heinousness and depravity. *State v. Murdaugh*, 97 P.3d 844, 856 (Ariz. 2004).[19] The Arizona courts have typically relied on five factors "to establish a heinous and depraved state of mind": "(1) relishing the killing, (2) commission of gratuitous violence, (3) mutilation of the victim, (4) senselessness of the killing, and (5) helplessness of the victim." *Carlson*, 48 P.3d at 1193-94 (citing *Gretzler*, 659 P.2d at 11-12); *see also, e.g.*, *State v. Detrich*, 932 P.2d 1328, 1339 (Ariz. 1997).

---

[19]The Arizona Supreme Court has alternately defined heinousness and depravity as focusing on the state of mind of the "killer," *see, e.g.*, *Arizona v. Djerf*, 959 P.2d 1274, 1287 (Ariz. 1998), "murderer," *see, e.g.*, *State v. Lopez*, 847 P.2d 1078, 1091 (Ariz. 1992); or "perpetrator," *see*, *e.g.*, *State v. Bocharski,* 189 P.3d 403, 420 (Ariz. 2008), rather than the "defendant" specifically. However, it has used these terms exclusively as an alternate means to identify the defendant, rather than to denote that heinousness and depravity can be found on the basis of the state of mind of an accomplice.

**[11]** The Arizona Supreme Court upheld the sentencing court's finding of depravity as to Robinson on the basis that the killing was senseless and that Sterleen was rendered helpless prior to her death. *Robinson*, 796 P.2d at 863. The court stated simply that "the gangland-style action of forcing two elderly persons to lay [sic] face down on the floor, tying them up, then senselessly shooting them amounts to depraved conduct." *Id.* We note initially that "senselessness and helplessness will ordinarily not be sufficient to prove heinousness or depravity." *State v. Ross,* 886 P.2d 1354, 1363 (Ariz. 1994). The Arizona Supreme Court's reliance solely on the two least probative of the *Gretzler* factors does not, however, conclusively render their finding arbitrary. Rather, our conclusion of arbitrariness derives from the court's total failure, again, to address the lack of evidence that Robinson was present for or ordered the killing of Sterleen. The court offers no explanation for how events that Robinson had no role in can illuminate his state of mind at the time they occurred.

Unsurprisingly, we have located no decision of the Arizona Supreme Court prior to or following its decision in this case in which a finding of a heinous or depraved state of mind was based on the manner of a killing that a defendant did not participate in or direct. The Arizona Supreme Court has generally been unwilling to impute heinousness and depravity to a defendant based on the actions of an accomplice. *See State v. Richmond*, 886 P.2d 1329, 1335 (Ariz. 1994) (refusing to find defendant possessed a heinous or depraved state of mind based on the driving of a vehicle over the body of the victim because "the evidence has never been clear regarding who drove the vehicle over the victim"), *abrogated on other grounds by State v. Mata*, 916 P.2d 1035, 1039 (Ariz. 1996); *State v. Bracy*, 703 P.2d 464, 482 n.8 (Ariz. 1985) (finding that heinousness and depravity could not be shown "by one of the killer's statements immediately before the killings" because "[i]t was never proven which of the three murderers made this statement, and we cannot impute vileness on all three men because of the statement of one of them"). We also

have implicitly recognized that the manner of a person's murder not performed or intended by a defendant is an "invalid consideration[ ]" in finding depravity. *Correll v. Stewart*, 137 F.3d 1404, 1420 (9th Cir. 1998). In the majority of the few cases in which the Arizona Supreme Court has been willing to impute heinousness or depravity to a defendant who did not personally kill a victim, it has made specific findings regarding the defendant's presence at and intention to assist the killing. *See State v. Anderson*, 111 P.3d 369, 395-96 (Ariz. 2005)*; State v. Cook*, 821 P.2d 731, 751-52 (Ariz. 1991); *State v. Correll*, 715 P.2d 721, 730-33 (1986); *State v. Tison*, 633 P.2d 335, 352-353 (Ariz. 1981). In the cases in which it has considered, but ultimately rejected a finding of heinousness or depravity as to a defendant who did not personally kill the victim, the Arizona Supreme Court has focused its analysis exclusively on aspects of the killing within the defendant's knowledge and control. *See Carlson*, 48 P.3d at 1193-94 (focusing on medical condition of victim chosen by defendant); *State v. Miles*; 918 P.2d 1028, 1030 (Ariz. 1996) (focusing on defendant's purpose in having defendant killed and defendant's participation in rendering victim helpless).

**[12]** We have located only two cases aside from *Robinson* in which the Arizona Supreme Court has found heinousness and depravity as to a defendant who was not present at the time of the killing. The court's analysis in those cases is instructive as to the arbitrariness of the court's conclusions here. In *State v. Speer*, 212 P.3d 787, 791-92 (Ariz. 2009), the defendant, while imprisoned, had an accomplice murder the victim because the victim was a potential witness against the defendant. The court applied the especially heinous, depraved, or cruel aggravating factor purely on the basis of the witness elimination motive. *Id.* at 802. In *State v. Milke*, 865 P.2d 779, 781-82 (Ariz. 1993), the defendant delivered her four year old son to two accomplices who murdered him at her request. The court found the defendant possessed a heinous and depraved state of mind on the basis of three factors: 1) the senselessness of the *defendant's desire* to have her son killed; 2) the help-

lessness of her son *at the time she delivered him to his ultimate killers*; 3) and her parental relationship with the victim. *Id.* at 785-86. Each of these aspects of the murder related directly to the defendant's identity and her personal choices and actions. In both cases the defendant ordered the murder, so that a fact-based inquiry into the defendant's state of mind concerning the murder could occur. And at no point in either case did the court rely on or even discuss the actual manner in which the defendants' accomplices murdered their victims, instead focusing on the defendants' own actions. This focus was presumably because the court realized the irrelevance of events occurring outside of the defendants' presence or control to understanding their states of mind. The court's failure here to recognize either the defendant's lack of any contemporaneous state of mind about a murder he did not order or participate in, or the irrelevance of the manner of the murder in determining Robinson's state of mind, makes its holding arbitrary in violation of the Eighth Amendment.

## B.    Claim 8: Ineffective Assistance of Counsel

A defendant's Sixth Amendment right to counsel in a criminal trial includes "the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The right attaches at both the guilt and sentencing phases. *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002). To prevail on his claim of ineffective assistance of counsel at sentencing, Robinson must demonstrate that "the performance of his counsel fell below an objective standard of reasonableness at sentencing and . . . that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Correll*, 539 F.3d at 942 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). We hold that Robinson has met his burden to demonstrate that he received ineffective assistance of counsel.

### 1.    Deficient Performance

Under *Strickland* we presume that counsel was competent. *Duncan v. Ornoski*, 528 F.3d 1222, 1234 (9th Cir. 2008), *cert.*

*denied*, *Duncan v. Ayers*, 129 S. Ct. 1614 (2009). Robinson can "rebut this presumption by showing that [counsel's] performance was objectively unreasonable under prevailing professional norms and was not the product of sound strategy." *Id.* (citing *Strickland,* 466 U.S. at 688-89). At the time Robinson was sentenced, prevailing professional norms imposed a duty on counsel to adequately investigate, develop, and present mitigating evidence in capital sentencing proceedings. *See Summerlin*, 427 F.3d at 630; *Ainsworth v. Woodford*, 268 F.3d 868, 877 (9th Cir. 2001) ("[Investigation] was as crucial in 1980 as it is today in order to assure individualized sentencing and the defendant's right to a fair and reliable capital penalty proceeding."); ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the penalty [phase]."); *see also Strickland*, 466 U.S. at 690-91.

**[13]** In preparing for the penalty phase of a capital trial, defense counsel has a duty to "conduct a thorough investigation of the defendant's background" in order to discover all relevant mitigating evidence. *Correll*, 539 F.3d at 942 (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)); *see also Williams*, 529 U.S. at 415 (O'Connor, J., concurring) (counsel has a duty to make a "diligent investigation into his client's troubling background and unique personal circumstances"). Certain forms of investigation are fundamental to preparing for virtually every capital sentencing proceeding. At the very least, counsel should obtain readily available documentary evidence such as school, employment, and medical records, *see Ainsworth v. Woodford*, 268 F.3d 868, 877 (9th Cir. 2001) (concluding that counsel was ineffective because he failed to obtain relevant records), and obtain information about the defendant's character and background, *see Boyde v. California*, 494 U.S. 370, 382 (1990) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged back-

ground, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." (internal quotation and citation omitted)). The investigation should also "include inquiries into social background and evidence of family abuse." *Summerlin*, 427 F.3d at 630 (citing *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005)). Counsel also has a "duty to investigate and present mitigating evidence of mental impairment, which includes examination of mental health records." *Lambright*, 490 F.3d at 1117 (quoting *Summerlin*, 427 F.3d at 630) (internal edits and quotation marks omitted). Although counsel will typically begin the investigation by interviewing the defendant, the investigation cannot end there unless the "defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful." *Strickland*, 466 U.S. at 691.

In *Smith v. Stewart*, 140 F.3d 1263 (9th Cir. 1998), counsel "did not perform any real investigation into mitigating circumstances, even though that evidence was rather near the surface," and gave no tactical reasons for his failure to do so. *Id.* at 1269. At a post-conviction hearing, Smith's counsel testified that he had spoken generally with Smith and with Smith's mother but said that he had received no information that would help with a mitigation defense. *Id.* We found that "the record . . . indicates that counsel asked nothing more than a few generalized questions and conducted none of the real probing for information that legal praxis assumes and even demands." *Id.* We noted that counsel could have pointed to Smith's sociopathic personality, drug history, his "fine set of family relationships," and his love and support for his children. *Id.* Because we found no justification for counsel's failure to develop this mitigation evidence, we held that counsel's performance was ineffective. *Id.*

Here, as in *Smith*, Robinson's trial counsel engaged in virtually no investigation and presented very little argument at the sentencing phase of the trial. Robinson's trial counsel's strategy at the sentencing phase was to focus on the state's

failure to prove aggravating circumstances. His sentencing memorandum addressed only two statutory mitigating circumstances — Robinson's minor role in the murder, and the fact that the killing was not foreseeable — and no nonstatutory mitigating circumstances. At the sentencing hearing, counsel did not call a single witness or introduce any evidence. Although Roberson said at argument that he could "cite a whole lot of mitigating factors as far as Fred is concerned," he only briefly discussed two nonstatutory circumstances: that Robinson did not have a history of harming people and that he was "apparently" a good father. The entirety of Roberson's oral argument at the penalty phase consisted of ten pages of double-spaced transcript.

Roberson conducted no investigation of Robinson's family history; he did not speak with any member of Robinson's family; he did not request school, medical, or employment records; and he did not request a mental health evaluation. By his own admission, Roberson limited his preparation to interviewing Robinson and asking him whether there were any witnesses that should be presented. It is not clear from the record how many times they met or for how long,[20] but it is clear that counsel did not ask any probing questions that would likely have led to the discovery of mitigating evidence. *See Smith*, 140 F.3d at 1269. Additionally, although counsel said he asked Robinson about potential trial witnesses, he did not say that he informed Robinson about what would constitute mitigating evidence to enable Robinson to assist effectively in the investigation.

**[14]** Roberson attempted to justify his failure to interview Robinson's family members by explaining that he thought it would be futile because some of Robinson's family members had testified against him during the guilt phrase of the trial. This decision was not one a reasonably competent attorney

---

[20]Roberson's personal time sheets and the time sheets he filed with the court had been shredded before the evidentiary hearing.

would have made. Robinson had fifteen children, only two of whom had testified against him. According to counsel, Robinson was a good father, making it likely that at least some of them would have been willing to testify on his behalf. He also had a wife, ex-wife, parents, and seventeen siblings who not only could have testified on Robinson's behalf, but also could have provided important background information about Robinson's childhood, providing leads for further investigation. We can find no reason for counsel to believe that interviewing these family members would be fruitless.

Counsel also failed to explore readily available sources of mitigating evidence concerning Robinson's potential for rehabilitation. If counsel had spoken with prison guards, they would have informed him that Robinson was a model prisoner. Robinson's good behavior has continued while he has been on death row; he gets along well with his fellow inmates, he is visited often by family members, goes to church regularly, and is classified as Level Five-One, the lowest security level possible for a death row inmate. A psychological evaluation of Robinson would have confirmed that he did not have a hostile or aggressive personality, but rather was generally helpful and easy going, and thus demonstrated a potential for rehabilitation and a low risk of future dangerousness. Counsel did not provide any tactical explanation for not presenting evidence of Robinson's potential for rehabilitation. There was no reason not to present such evidence, as this was not a situation where introducing character evidence would have opened the door for the prosecution to introduce negative character evidence. Counsel's decision to forgo any investigation into Robinson's potential for rehabilitation, even though such evidence was close at hand, was not strategic and fell below prevailing professional norms at that time.

[15] Had Roberson conducted an effective penalty-phase investigation, he would have learned of aspects of Robinson's character and background that would have provided classic mitigation evidence at sentencing, including: Robinson's

impoverished background; his unstable and often abusive upbringing; his multiple episodes of childhood sexual abuse; his low intelligence; his personality disorder; his non-violent nature; and his potential for rehabilitation.[21] Instead, counsel's limited investigation yielded almost nothing of use. Accordingly, we conclude that Roberson's performance was deficient.

## 2. Prejudice

[16] Prejudice in a capital sentencing proceeding is measured by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. Robinson can establish that he was prejudiced by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "less than the preponderance more-likely-than-not standard." *Summerlin*, 427 F.3d at 643. Rather, it "is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. If there is a reasonable probability that the sentencing judge would not have imposed death if he was aware of the mitigating circumstances, petitioner has been prejudiced and is entitled to relief. *Summerlin*, 427 F.3d at 643 (citing *Wiggins*, 539 U.S. at 537). "[I]t is not necessary for the habeas petitioner to demonstrate

---

[21]The dissent argues that Roberson's failure to discover this evidence does not constitute deficient performance in light of the Supreme Court's recent decisions in *Bobby v. Van Hook*, 130 S. Ct. 13 (2009), and *Wong v. Belmontes*, 130 S. Ct. 383 (2009). But in each of those cases, defense counsel presented a significant amount of mitigating evidence, including evidence of the kind Roberson failed to present here. *See Bobby*, 130 S. Ct. at 18; *Wong*, 130 S. Ct. at 387. Rather, this case is closely similar to *Porter v. McCollum*, 130 S. Ct. 447 (2009), where the Court found deficient performance where defense counsel failed to subpoena school, medical, or military service records or interview any members of the defendant's family, and as a result did not learn of his abusive childhood, military service, substance abuse, and impaired mental health. *Id.* at 452-53.

that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances." *Correll*, 539 F.3d at 951-52 (citing *Williams*, 529 U.S. at 398).

At the time Robinson was sentenced, Arizona's death penalty statute required a judge to impose the death penalty if one or more aggravating circumstances were proved beyond a reasonable doubt and if the mitigation established by a preponderance of the evidence was not sufficiently substantial to justify leniency. Ariz. Rev. Stat. § 13-703(E) (1988) (current version at Ariz. Rev. Stat. § 13-751). Thus, at that time, "failure to present a mitigation defense all but assured the imposition of a death sentence under Arizona law." *Summerlin*, 427 F.3d at 640. In *Summerlin*, the sentencing court found that two aggravating circumstances applied to the defendant: the defendant had a prior felony conviction and committed the murder in an especially cruel, heinous, or depraved manner. *Id.* at 641. Because defendant's counsel presented no mitigating evidence, the court was bound under Arizona law to impose the death sentence. *Id.* at 640. We concluded "that the failure of trial counsel to investigate, develop, and present mitigating evidence at the penalty phase hearing has undermined our confidence in the sentence of death imposed by the trial judge" because, "[h]ad an adequate mitigation strategy been presented, there is a 'reasonable probability' that an objective sentencing factfinder 'would have struck a different balance.' " *Id.* at 643 (quoting *Wiggins*, 539 U.S. at 537).

The state argues, and the district court held, that Robinson was not prejudiced because Robinson failed to establish a causal connection between the mitigating evidence and the crime. The district court found: (1) that there was no evidence that Robinson's ability to conform his conduct to the law or to know the difference between right and wrong were significantly impaired; (2) that Robinson "did not establish a causal connection between [his impoverished childhood, sexual abuse, and unfair treatment] and his offense-related conduct;" and (3) that there was no connection between his "substan-

dard education, low average intelligence, diabetes, and physical disability" and the crime. The district court concluded that even if this evidence had been presented at sentencing, it "would have been accorded little mitigating weight" and could not outweigh the two aggravating factors. Thus, it was "not reasonably probable" that the proffered evidence would have undermined confidence in the outcome of the sentencing hearing.

**[17]** The district court's holding is contrary to Ninth Circuit and Supreme Court precedent. The Supreme Court has expressly rejected the requirement that a defendant establish an explanatory nexus between the proffered mitigating evidence and the crime. *See Smith v. Texas*, 543 U.S. 37, 45 (2004) (holding that evidence of a troubled childhood and limited mental abilities is relevant for mitigation purposes). We explained the reasoning behind rejecting a nexus requirement as follows:

> If evidence relating to life circumstances with no causal relationship to the crime were to be eliminated, significant aspects of a defendant's disadvantaged background, emotional and mental problems, and adverse history, as well as his positive character traits, would not be considered, even though some of these factors, both positive and negative, might cause a sentencer to determine that a life sentence, rather than death at the hands of the state, is the appropriate punishment for the particular defendant. This is simply unacceptable in any capital sentencing proceeding, given that "treating each defendant in a capital case with that degree of respect due the uniqueness of the individual," and determining whether or not he is deserving of execution only after taking his unique life circumstances, disabilities, and traits into account, is constitutionally required.

*Lambright*, 490 F.3d at 1115 (quoting *Lockett v. Ohio*, 438 U.S. 586, 605 (1978)). Moreover, "whether counsel's failure to present evidence related to antisocial personality disorder and long-term drug use was prejudicial did not turn on 'whether those precluded [the defendant] from knowing right from wrong . . . .' " *Id.* (quoting *Smith*, 140 F.3d at 1271). Thus, the district court erred when it relied on Robinson's failure to demonstrate a causal connection between the evidence and the crime as its basis for assigning the evidence minimal mitigating weight.

The state also argues that it was not reasonably likely that the sentencing judge would have rendered a different decision if the mitigating evidence had been presented because the Arizona court already determined in the post-conviction proceedings that the additional evidence was not sufficient to warrant leniency. First, the state court, like the district court, erroneously imposed a requirement that Robinson prove a causal connection between the mitigation evidence and the crime. It, therefore, improperly rejected or under-weighted valid mitigating evidence. Compounding this problem, the state court weighed the proffered evidence against two statutory aggravating circumstances: especially cruel, heinous, or depraved conduct and procuring the commission of the offense by a promise of something of pecuniary value. We have held above, however, that the state court arbitrarily applied the aggravating circumstance of especially cruel, heinous, or depraved conduct to Robinson. Our confidence in the court's imposition of the death sentence has been undermined because, had the sentencing judge properly evaluated the mitigating evidence offered in the evidentiary hearing and weighed it against the single aggravating circumstance of procuring the offense by a promise of something of pecuniary value, there is a reasonable probability that the court would have imposed a sentence other than death. We conclude that Robinson has established that he was prejudiced by counsel's ineffective assistance.

**[18]** In sum, Roberson's failure to conduct a thorough investigation of potential mitigating evidence and to present an adequate mitigation strategy fell below reasonable standards of professional conduct for attorneys representing defendants at a capital sentencing. Robinson was prejudiced by counsel's ineffective assistance because it was reasonably likely that the outcome of sentencing would have been different had the state court considered the mitigating evidence in the proper light against the single surviving aggravating circumstance. We hold therefore that the district court erred in finding that Robinson did not receive ineffective assistance of counsel.

## IV.   Conclusion

**[19]** The district court erred when it held that Robinson's claim challenging the application of the especially cruel, heinous, or depraved conduct aggravating circumstance was procedurally barred. On the merits, we hold that the state court arbitrarily and capriciously applied the especially cruel, heinous, or depraved conduct aggravating circumstance to Robinson. We also hold that Robinson received ineffective assistance of counsel in the penalty phase. We conclude that Robinson is entitled to relief in the form of a new penalty phase trial. We reverse the district court's denial of a writ of habeas corpus as to the penalty phase and remand with instructions to grant the writ of habeas corpus unless the state court undertakes resentencing proceedings within a reasonable time to be determined by the district court.

**REVERSED** and **REMANDED** for issuance of a conditional writ of habeas corpus.

**Volume 2 of 2**

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent. The record in this case supports the district court's determination that Fred Robinson's claim challenging application of the cruelty prong of the "cruel, heinous and depraved" aggravating factors under Arizona's death penalty statute is procedurally barred. Although a closer question is presented by application of the heinous/depraved prongs of the statutory aggravating factors, the Arizona state courts did not act arbitrarily and capriciously in applying the heinous/depraved prongs of the statutory aggravating factors when considering the facts underlying the murder of the elderly victim. *See Styers v. Schriro*, 547 F.3d 1026, 1033 (9th Cir. 2008) ("A state court's finding of an aggravating circumstance in a particular case — including a de novo finding by an appellate court that a particular offense is especially heinous or depraved — is arbitrary or capricious if and only if no reasonable sentencer could have so concluded.") (citation, alterations, and internal quotation marks omitted). Finally, as recently reiterated by the United States Supreme Court, any failure by defense counsel to present additional mitigation evidence did not prejudice Robinson.

As a preliminary matter, I note that even if the heinous/depraved prongs of the statutory aggravating factors were arbitrarily applied in determining the sentence to be imposed, Robinson's procedural default of his claim involving the cruelty prong of the statutory aggravating factors would be sufficient to sustain imposition of the death penalty. *See State v. Gretzler*, 659 P.2d 1, 10 (Ariz. 1983). Therefore, I first examine the question of procedural default of the claim involving application of the cruelty prong of the statutory aggravating factors.

To avoid application of the procedural bar to his claim challenging application of the cruelty prong of the statutory aggravating factors, Robinson was required to "present[ ] the

*factual and legal* basis for his claim[ ] to the state courts . . ." *Moorman v. Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005) (emphasis added).

Before the Arizona Supreme Court, Robinson argued generally that "imposition of the death penalty was in violation of the statute and of the Constitution of the United States." We have not deemed a conclusory argument such as this sufficient presentation of a claim to avoid a procedural bar. *See Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005) ("In this circuit, the petitioner must make the federal basis of the claim explicit either by specifying particular provisions of the federal Constitution or statutes, or by citing to federal case law."). Indeed, Robinson's specific argument regarding the cruelty prong of the statutory aggravating factors stated:

> Cruelty involves the infliction of pain and distress on the victims. The State must show by evidence that the victims *actually* suffered physical or mental pain prior to the death. Cruelty is not shown if the evidence is inconclusive. The State produced *no* evidence to show that the victim actually suffered pain or distress to the extent necessary to make this finding. Mr. Hill testified that he was not aware of what actually occurred because he was knocked out, not shot. Mrs. Hill's last words, as heard by Mr. Hill, concerned a desire that her feet be covered up, not a plea for mercy or an expression of fear that she was about to be killed. There is no concrete evidence to support the State's theory that Mr. Hill was shot first but even if he was, Mrs. Hill was shot almost immediately thereafter without waiting a long time to be shot.

(Emphasis in the original) (citations omitted). The Arizona Supreme Court addressed the cruelty factor in the context presented by Robinson. *See State v. Robinson*, 796 P.2d 853, 862-63 (Ariz. 1990).

However, in his amended habeas petition, Robinson completely shifted his argument regarding the cruelty prong. There, Robinson asserted:

> In Robinson's case, evidence arguably existed from which to conclude that Mrs. Hill suffered, thereby putting at issue the applicability of the 'cruelty' factor to the defendants . . . Significantly, neither Judge Bradshaw nor the Arizona Supreme Court made any finding that Robinson either "intended" or "reasonably foresaw" that Mrs. Hill would suffer as a result of Robinson's actions. The evidence presented at trial or sentencing was that Robinson was not in the house at the time of the murder. No evidence was introduced at trial and sentencing, excluding the hearsay statements from Washington that were later disallowed, that Robinson had any knowledge that a murder would even take place . . .

(Citations omitted).[1]

The majority characterizes the variant argument in the federal habeas petition as a more detailed theory than the one Robinson presented to the Arizona Supreme Court. *See* Majority Opinion, p. 2737. However, the theory presented in the federal habeas petition was markedly different than the theory presented before the Arizona state courts. In the Arizona state courts, Robinson argued that the cruelty prong of

---

[1] Acceptance of Robinson's argument could minimize the importance of exhaustion in the habeas context. A habeas petitioner could present one argument to the state courts, and, once that argument is rejected, the petitioner could strategically shift to a new argument in her or his federal habeas petition. This is reflected by Robinson's contradictory arguments before the state court ("The State produced *no* evidence to show that the victim actually suffered pain or distress to the extent necessary to make this finding.") (emphasis in the original), and in his habeas petition ("In Robinson's case, evidence arguably existed from which to conclude that Mrs. Hill suffered . . .").

the statutory aggravating factors was inapplicable because there was no evidence that the victim actually suffered significant pain or distress. In his federal habeas petition, Robinson argued that the cruelty prong of the statutory aggravating factors was inapplicable because there was no evidence that Robinson intended or reasonably foresaw that the victim would suffer. In the state court, Robinson's argument focused on the victim's pain (or lack thereof). In the federal court, Robinson's argument focused on his intent to cause the victim pain (or his lack of intent). It is more accurate to say that Robinson presented a different theory in federal court than to say that he presented a more detailed theory in federal court. More to the point, the different theory argued in federal court was never presented to the state courts and is now procedurally barred. *See Moorman*, 426 F.3d at 1056 (requiring presentation of the factual and legal bases of the petitioner's claim to the state courts).

Robinson's citation to *Jeffers v. Ricketts*, 832 F.2d 476 (9th Cir. 1987), *rev'd sub nom. Lewis v. Jeffers*, 497 U.S. 764 (1990), is singularly unpersuasive. In fact, Robinson's citation to *Jeffers* underscores his emphasis in state court on the asserted lack of pain to the victim. Immediately after the citation to *Jeffers*, Robinson argued that: "An especially cruel murder involves the senseless or sadistic infliction of great pain. That is not present in this case and, therefore, the sentence must be supported by heinous and depraved . . ." (Citation Omitted). Absolutely no mention was made of Robinson's lack of intent to cause pain when discussing the cruelty prong of the statutory aggravating factors. More importantly, Robinson's reference to the fact that he was not inside the residence was made in conjunction with his discussion of the heinous prong of the statutory aggravating factors, not as part of his challenge to application of the cruelty prong of the statutory aggravating factors. Fairly read, Robinson's brief to the Arizona Supreme Court simply did not raise the issue he now argues, ie., whether the evidence adequately established that Robinson had the intent to inflict pain upon

the victim, or reasonably foresaw that the victim would suffer pain. For that reason, I would hold that Robinson's challenge to the cruelty prong of the statutory aggravating factors is foreclosed.

Because the existence of facts supporting application of the cruelty prong of the statutory aggravating factors would be adequate to sustain the death sentence imposed, I would end my analysis of Robinson's sentencing challenge with that conclusion. However, because my colleagues in the majority have also concluded that the state court's finding that the victim was killed in a heinous/depraved manner was arbitrary, I will comment briefly on that point.

I note initially that Robinson's absence from the interior of the residence does not give him a pass on culpability for the murder of the elderly victim. *See State v. Dickens*, 926 P.2d 468, 491-92 (Ariz. 1996) (in banc); *see also State v. Nichols*, 195 P.3d 207, 213 (Ariz. Ct. App. 2008). ([E]vidence that a defendant was not present at a crime scene is not, as a matter of law, directly contrary to or inconsistent with a guilty verdict.") (citation omitted).

We should also keep in mind that "[f]ederal habeas review of a state court's application of aggravating factors is limited to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." *Moormann*, 426 F.3d at 1053 (9th Cir. 2005) (citation and internal quotation marks omitted). "We examine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation and internal quotation marks omitted). When viewed through this prism rather than through the lens of a post-hoc factfinder, Robinson's claim fails.

Although the Arizona case of *State v. Carlson*, 48 P.3d 1180 (Ariz. 2002) (in banc) makes this a closer case on the

merits, I remain of the view that the facts support application of the heinous/depraved prongs of the statutory aggravating factors, especially when one considers that the same court that decided *Carlson* rejected Robinson's challenge to application of the heinous/depraved prongs of the statutory aggravating factors.

In *Carlson*, 48 P.3d at 1193, the Arizona Supreme Court held that "[t]he heinous and depraved portion of the [statutory aggravating factors] focuses on the defendant's state of mind at the time of the crime. However, the inquiry concentrates on the defendant's mental state as evidenced through [his] actions . . ." (citations omitted).

Robinson relies on his absence from inside the residence to defeat application of the heinous/depraved prongs of the statutory aggravating factors. However, the Arizona Supreme Court did not view Robinson's absence as determinative when discussing the heinous/depraved prongs. *See Robinson*, 796 P.2d at 862. To the contrary, the Arizona Supreme Court noted that "Robinson provided the murder weapon and transported [the triggerman] to the home of his common-law wife's parents. There is no evidence that [the triggerman] knew the [victims] or where they lived but for the guidance of Robinson." Although Robinson did not commit the actual murder, the record reflects, and the Arizona Supreme Court found, that he definitely set the murder in motion. *See id.* at 864 (noting that "Robinson masterminded the trip). Although one could disagree with that finding, it is much more difficult to argue that the finding is arbitrary. Indeed, to the extent Robinson challenges the Arizona Supreme Court's interpretation of the meaning of the statutory aggravating factors, his challenge is unavailing. *See id.* at 863 ("As difficult as it may be to define depravity, the gangland-style action of forcing two elderly persons to lay face down on the floor, tying them up, then senselessly shooting them amounts to depraved conduct.") (citation omitted); *see also, Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) ("We accept a state court's inter-

pretation of state law, and alleged errors in the application of state law are not cognizable in federal habeas corpus . . .") (citations omitted).

The evidence that a year earlier Robinson and two cohorts had entered Susan's sister's home in search of Susan, Robinson's common-law wife, is not so easily discounted. The two cohorts entered the house with guns and tied up Susan's sister and Susan's niece. Although no one was harmed, the record reflects that it was only the presence of Susan's niece that prevented a murder from occurring.

Finally, the United States Supreme Court has decided two cases just this month that, in my view, foreclose a determination that Robinson was prejudiced by any failure of defense counsel to present additional mitigation evidence during the sentencing phase of the proceedings. In *Bobby v. Van Hook*, No. 09-144, ___ S. Ct. ___, 2009 WL 3712013 (November 9, 2009), a pre-AEDPA case, *see id.* at *2, the Supreme Court considered whether Van Hook's "attorneys were ineffective during the penalty phase because they did not adequately investigate and present mitigating evidence . . ." *See id.* at *1. Applying *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court ruled that Van Hook suffered no prejudice because "the minor additional [mitigation] details the trial court did not hear would [not] have made any difference. *Van Hook*, 2009 WL 3712013 at *4.

Similarly, in *Wong v. Belmontes*, No. 08-1263, __ S. Ct. ___ 2009 WL 3712013 (November 9, 2009), the Supreme Court found a lack of prejudice where the petitioner accused his counsel of failing to "dig deeper" for additional mitigating evidence. *See id.* at *4.

In this case, the majority lists the following "classic mitigation evidence" that defense counsel, in the majority's view should have discovered: "Robinson's impoverished background; his unstable and often abusive upbringing; his multi-

ple episodes of childhood sexual abuse; his low intelligence; his personality disorder; his non-violent nature; and his potential for rehabilitation." *See* Majority Opinion, p. 2751-52. However, the Supreme Court's rulings in *Van Hook* and *Wong* clarify that these asserted failings cannot support a claim under *Strickland*. Fortuitously, in this case, we do not have to try to determine whether the asserted deficiencies would have made a difference in the sentence imposed. In this case, we know the answer because the same judge who imposed the sentence of death presided over the postconviction review proceedings. After hearing all the mitigation evidence that Williams mustered after-the-fact, the sentencing judge declined to entertain the prospect of changing the previously imposed sentence.

At the postconviction review proceedings before the sentencing judge, Williams presented testimony from Juan Gonzales, a Corrections Officer at the Florence Correctional Institution. Officer Gonzales testified favorably regarding Robinson's contact with his family and his lack of disciplinary problems. Officer Gonzales testified that Robinson had not displayed any violent tendencies, was "very easy to work with," and got along well with the other inmates, and had been classified at the lowest level of security since his incarceration. Officer Gonzales informed the court that Robinson attended church "quite often." According to Officer Gonzales, if Robinson were to be placed into the general population, "he would do well."

Dr. Tod Roy, a psychologist, testified that, in addition to conducting a clinical interview with Robinson, he administered the Minnesota Multi-Phasic Personality Inventory test, intelligence testing, the Rorschach diagnostic test and the Thematic Apperception test. Dr. Roy also reviewed Robinson's school records and the psychiatric evaluation conducted by Dr. Eva McCullars.

In addition, Dr. Roy interviewed Robinson's father. Dr. Roy opined that Robinson "had the potential to be rehabilitat-

ed"; that he had close family ties; that he had good behavior while imprisoned, noting that he "carrie[d] the lowest risk status that can be applied to anyone on death row"; and that Robinson was not dangerous or likely to re-offend.

Dr. Roy disclosed test results reflecting Robinson's low level of intelligence and educational achievement, and testified at length about Robinson's disadvantaged childhood, describing Robinson as "born into an impoverished environment of a rural nature . . ." He relayed that Robinson lived in a segregated community and was once "pulled off a sidewalk by his aunt to allow a white woman to pass."

By far the most traumatic event described by Dr. Roy was Robinson's being sodomized by his mother's boyfriend when he was a child. Dr. Roy also informed the court about the heartbreak Robinson experienced when Robinson's father publicly repudiated Robinson's mother and most of Robinson's siblings during divorce proceedings. Finally, Dr. Roy testified that Robinson's aunt sexually abused him for a period of time, and that he was subjected to beatings.

After hearing all this evidence, the post-conviction review judge, who was also the sentencing judge, determined that the evidence presented would not have affected the sentence imposed.

Specifically, the post-conviction court ruled:

> Mr. Robinson has been examined and found to have no mental [sic] evidence of mental disease per Dr. McCullars and an Axis II suggestion of Borderline Personality Disorder by Dr. Roy. Nothing in the record supports a suggestion that this defendant was unaware of the activities at the Hill home on the evening of the crime and the court now rejects, and would have at sentencing hearings, rejected a suggestion of Borderline Personality Disorder.

> This court accepts as true that Mr. Robinson has an antisocial personality disorder and is poorly adjusted to living in society, but there is nothing in his makeup now, nor in the opinion of the experts was there anything at the time of the offenses, which lessened his ability to differentiate right from wrong or to conform his actions with the law . . .

The court was aware that Robinson was a model prisoner, but remained unconvinced that his model behavior translated into a potential for rehabilitation or lack of future danger to society. The court held that "to the extent any [of the claimed mitigating factors] may be, or have been present [they] certainly are/were not sufficient to affect the sentence imposed." The court explicitly discussed that although a lack of education was shown, no lack of intelligence was shown. Rather, the post-conviction court reviewed Robinson as "experienced, street smart and . . . wise enough to plan carefully and act forcibly for his own well being." The court reiterated its view that "[n]one of these matters are, or have been sufficient to mitigate [Robinson's] sentence imposed."

The state post-conviction court fully considered the mitigation evidence presented by Robinson. Its subsequent emphatic ruling that the mitigation evidence would not have affected the sentence imposed compels a conclusion of no prejudice under the rationale of *Van Hook* and *Wong*. For that reason and because Robinson's challenge to the cruelty prong of the statutory aggravating factors is procedurally barred, I respectfully dissent.